Donn L. BERIAULT et al., Plaintiffs,

v.

LOCAL 40, SUPER CARGOES & CHECK-
ERS OF the INTERNATIONAL LONG-
SHOREMEN'S & WAREHOUSEMEN'S
UNION, and International Longshore-
men's & Warehousemen's Union, De-
fendants.

No. 71–419.

United States District Court,
D. Oregon.

Feb. 20, 1978.

Charles J. Merten, Sherman B. Kellar, Portland, Or., for plaintiffs.

Norman Leonard, San Francisco, Cal., for International Longshoremen's & Warehouseman's Union.

Frank H. Pozzi, Portland, Or., for Local 40.

## OPINION ON REMAND

SKOPIL, Chief Judge:

This matter is before the court on remand from the court of appeals. *Beriault*[1] *v. ILWU*, 501 F.2d 258 (9th Cir. 1974). For the reasons given below, I find for defendants.

## PARTIES AND JURISDICTION

Plaintiffs are a group of individuals[2] who have been employed during various periods as casual checkers on the Portland, Oregon, area waterfront. A "checker" or "clerk"[3] performs essentially clerical and record-keeping duties in connection with the loading and unloading of cargo aboard ships. See, e. g., Def.Ex. A–1, §§ 1.251 *et seq.* The duties of a checker may be contrasted with those of a longshoreman, who per-

---

1. Many of the papers in the record (e. g., Amended Pretrial Order filed September 9, 1976) refer to the first named plaintiff as "Beriault", with two "R's". The docket sheet and Court of Appeals opinion use one "R". For consistency I will do the same, but apologize to Mr. Beriault for the possible misspelling of his name.

2. Class certification has never been sought.

3. I will use the terms interchangeably in this opinion.

forms the actual loading and unloading through physical effort and operation of dock and shipboard machinery.

A "casual" checker, under the applicable collective bargaining agreements (discussed in more detail *infra*), stands at the lowest level in the hierarchy of waterfront checkers. A casual has the lowest priority for dispatch to clerking work assignments. Registered "A" checkers have highest priority, followed by registered "B" checkers and "A" longshoremen. The A and B men enjoy various other advantages over casuals.

Plaintiffs allege that defendants have breached their duties of fair representation with respect to plaintiffs in connection with negotiation of the discriminatory contract provisions. Defendants now in the case are Local 40, Super Cargoes & Checkers of the International Longshoremen's & Warehousemen's Union ("Local 40"), and the International Longshoremen's & Warehousemen's Union ("International" or "ILWU").

██ The court has subject matter jurisdiction under 28 U.S.C. § 1337. *Beriault, supra,* 501 F.2d at 263; *Retana v. Apartment, Motel, Hotel & Elevator Optrs. Local 14,* 453 F.2d 1018 (9th Cir. 1972).

## PROCEDURAL STATUS

The long procedural history of this case is apparent from the first district court opinion (*Beriault v. ILWU,* 340 F.Supp. 155 (D.Or.1972)) and the court of appeals opinion (*supra*). For convenience, I will summarize the prior proceedings.

Plaintiffs filed this action in June, 1971, alleging violations of the collective bargaining agreement by all defendants and breach of duty of fair representation by the unions in negotiating and enforcing the contract. Defendants were Local 40, the International, and Pacific Maritime Association ("PMA"), bargaining representative for maritime employers. By an amended complaint, plaintiffs joined as defendants the trustees of various Union-PMA welfare and benefit funds.

In February, 1972, trial was held before Judge Belloni on the segregated issues of preemption by the National Labor Relations Board ("NLRB") and of failure by plaintiffs to exhaust contractual remedies. Judge Belloni held that the matters alleged by plaintiffs fell within the exclusive jurisdiction of the NLRB and, further, that plaintiffs had failed to exhaust administrative remedies provided by the contract. Accordingly, he determined that the claims should be dismissed. 340 F.Supp. at 157.

On appeal, the Ninth Circuit held that the claimed breaches of contract properly invoked federal court jurisdiction under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. The Court agreed with Judge Belloni, however, that these claims should be dismissed for plaintiffs' failure to exhaust contractual remedies. 501 F.2d at 261–262.

The Court went on to consider the claims of breach of duty of fair representation. It held that claims of breach of such duty in *enforcing* the contract were not preempted by the NLRB but again were barred by failure to resort to contractual remedies. Finally, the Court held that a good cause of action remained as to alleged breaches of fair representation in *negotiating* the collective contract. 501 F.2d at 263–266.

As a result of the Court of Appeals opinion and remand, the question now before me is limited to whether defendants Local 40 and ILWU were "arbitrary" in negotiating and signing a collective bargaining agreement under which plaintiff casuals experience reduced work opportunity and fewer employment benefits as compared to other workers. 501 F.2d at 264. All issues as to performance under or administration of the contract are out of the case.

## RECORD CONSIDERED

Trial was held September 22 and 23, 1976. By agreement of the parties and order of the court, testimony was received in a number of forms: in the traditional live manner, by deposition, and by written witness statements. As to the witness statements, the parties stipulated that the witness would testify in accordance with the state-

ment if called live. The parties did not, of course, stipulate to the truth of the matters asserted in the statements. For each witness for whom any form of direct testimony was offered, the opposing side had the opportunity to conduct live cross-examination.

Prior to trial each side submitted written objections to portions of the witness statements offered by the opponent. My rulings on the objections were made available to counsel before trial began.[4]

The record also includes extensive documentary evidence. At trial objections were interposed to the admissibility of many exhibits. I reserved ruling on most objections. In this case no one exhibit or group of exhibits is crucial to my decision. There is objectionable material in many of the exhibits. In this bench trial a liberal standard of admissibility applies. No good purpose would be served, therefore, by laborious exhibit-by-exhibit rulings. I considered each exhibit for what it was worth. All outstanding objections are overruled.

Following receipt of the post-trial briefs, I began my study of the evidence, the arguments of counsel, and the authorities cited. I directed a letter to counsel setting out nine legal and factual issues as to which I requested further clarification and argument. Plaintiffs filed their response on September 12, 1977. Defendants filed their submission on October 3, 1977, on which date the matter was taken under advisement.

## DISCUSSION

*The Contract*

The record thoroughly documents the history of collective bargaining on the Pacific Coast waterfront since the 1930's. As noted above, the issue before me is whether defendants have breached their duty of fair representation owed to plaintiff casuals in negotiating the collective bargaining agreements. The current contract contains pro-

visions developed over many years of bargaining. The successive contracts rarely reflect dramatic changes in the relationship between the unions and employees on the one hand and the employers on the other. For convenience, therefore, I will generally cite only to provisions of the most recent contract.

The current contract is set out in two pamphlets. One is entitled "Pacific Coast Clerks' Contract Document, 1975–1978" (abbreviated by the parties as the "PCCCD"). Def.Ex. A–1. The other is "Pacific Coast Longshore Contract Document, 1975–1978" ("PCLCD"). Def.Ex. A–2.

Under the PCCCD, all work assignments for clerks are handled through dispatching halls maintained by Joint Labor Relations Committees for each port area. Pl.Ex. A–1, § 8. The Joint Port Committees consist of representatives of the union and of PMA and exercise substantial responsibilities in administering the collective contract. *Id.,* § 17.1.

Among the responsibilities of the Joint Port Committee is that of adding to and subtracting from the list of registered clerks. *Id.,* § 8.31. As noted above, registered A and B checkers have dispatch preference over casual checkers. Further, a point stressed by plaintiffs, registered *longshoremen* (who are not members of Local 40, an all-clerk local) have preference over casual clerks. *Id.,* § 20.821. Further, the Portland Joint Clerks' Labor Relations Committee has developed the practice of accepting "strikers" as "extra" or "temporary" casuals. Under this program, persons who can show that they are out of work due to strikes in a non-maritime industry can qualify for issuance of "casual cards". Possession of such a card entitles the holder to dispatch along with "regular" casuals (i. e., non-registered persons regularly seeking employment as clerks, such as plaintiffs).[5] See Pl.Ex. 3.

---

**4.** The rulings apparently were not made a formal part of the record. Accordingly, I am filing contemporaneously with this opinion copies of letters from each party in which the objections

are stated. Next to each objection I wrote "O", for "overruled" or "S", for "sustained".

**5.** Plaintiffs have introduced evidence that the Joint Committee and unions *breached* this pro-

To summarize the contractual dispatching system, first priority for work goes to fully registered or A clerks, followed in order by partially registered or B clerks, and then by A and B longshoremen. At the bottom of the list—at the same level as "strikers"— are casual clerks such as plaintiffs. The evidence shows that in recent years little or no actual work has been made available to casuals.

In addition to reduced work opportunity, casuals receive relatively reduced or limited benefits of many other kinds under the contract. Examples are set out in plaintiffs' supplemental brief filed September 12, 1977, and include the following: denial of eight-hour guaranteed work or pay upon reporting to a job; denial of designated days off and right to take leaves of absence; denial of dispatch for full duration of a job which lasts for more than one day; denial of paid holidays; requirement for actual physical presence in the dispatching hall; denial of welfare benefits (even though the employers pay designated amounts into the welfare funds for each hour work by *any* employee, including casuals).

The evidence thus shows and I specifically find that the collective bargaining agreement favors in a significant way the registered members of the waterfront work force, both clerks and longshoremen, as compared to casual checkers. As stated before, I must decide whether the existence of this differentiation reflects a breach of duty of fair representation owed by Local 40, the International, or both, as owed to plaintiffs.

*Bargaining Unit*

■ One of plaintiffs' basic contentions is that the bargaining unit of which they are members consists solely of Pacific Coast *clerks/checkers* (registered and casual), but

not *longshoremen.* Plaintiffs point to the provision, *supra,* under which registered longshoremen are dispatched ahead of casual clerks to clerk jobs. Plaintiffs argue that defendants are in breach of duty of fair representation in negotiating for and agreeing to such a provision. The basis of this argument is the proposition that a bargaining representative must not bargain for persons not in the bargaining unit to the detriment of members of the unit.

There is apparently no dispute in this case that the bargaining unit in which plaintiffs are members is coastwide in scope. It appears that bargaining units covering the entire Pacific Coast have long been the pattern in the waterfront industry. See, e. g., *Waterfront Employers Association,* 71 NLRB 80 (1946). Plaintiffs argue, however, that no valid de facto coastwide unit of both clerks and longshoremen can exist, that as a matter of fact no such unit does exist, and that if such a unit is found to exist, it was a breach of duty of fair representation to create it. Pl.Rep.Br. 3–8, Pl.Supp'l. Br. 4–5.

While the matter is not free from doubt, I am of the opinion that for purposes of fair representation claims, a legally valid *de facto* bargaining unit of both clerks and longshoremen can exist and that such a unit does exist in this situation.[6]

Most of the cases and decisions cited by both sides are not directly in point. Most arose in connection with NLRB certification and election proceedings, in which the appropriateness of a bargaining unit is directly in issue. Here, no one is seeking formal certification or decertification of a bargaining unit.

Plaintiffs have cited and I have found no authority to the effect that separately certified bargaining units may not form *de facto* mergers or that such a merger is *per se* a breach of duty of fair representation. See

---

vision by dispatching striking unionists *ahead* of casuals. The Court of Appeals opinion, *supra,* makes clear that trial on remand is limited to consideration of union conduct in *negotiating* contract provisions as contained in PCCCD, PCLCD, and Joint Port Committee resolutions.

6. This finding does not necessarily insulate defendants from liability. As is discussed *infra,* a bargaining representative owes a duty of fair treatment to all constituent groups within the bargaining unit.

*NLRB v. Teamsters,* 194 NLRB No. 106, 79 LRRM 1182 (1971), enforced, 82 LRRM 2016 (9th Cir. 1972).

As a factual matter, the evidence makes clear that at least since the late 1950's a single coast-wide bargaining unit of clerks and longshoremen has existed. It is true that the PCCCD and PCLCD are published in separate pamphlets. The introduction to each, however, contains the following language:

> "This Contract Document is a part of the ILWU–PMA Pacific Coast Longshore and Clerks' Agreement." Def.Ex. A–1, at 1; Def.Ex. A–2, at 1.

Moreover, the actual formulation of bargaining demands and negotiation of contracts is done on a unified basis.

Since a valid, *de facto* coast-wide bargaining unit [7] of clerks and longshoremen exists, this is not a case involving bargaining for persons not in the unit to the detriment of members of the unit.

### Discrimination Within the Bargaining Unit

■ Under the National Labor Relations Act, the bargaining representative has the *exclusive* authority to negotiate on behalf of employees in the bargaining unit "in respect to rates of pay, wages, hours of employment, or other conditions of employment." 29 U.S.C. § 159(a). This exclusive authority, however, implies certain responsibilities to all members of the bargaining unit. As stated by the Supreme Court:

7. At least once during these proceedings each defendant (Local 40, International) has taken the position that the *other* defendant is the sole bargaining representative of plaintiffs. Local 40 Mot. to Dismiss (Sept. 20, 1976); International Post-Trial Br. at 4. In view of my findings (to be discussed *infra*) that no breach of duty of fair representation occurred, it is not necessary to decide which defendant is "the" bargaining representative. The evidence suggests, however, that both so act, with the International often acting on behalf of Local 40. See, e. g., Def.Ex. A–1, Title Page ("Pacific Coast Longshore and Clerks' Agreement for Clerks and Related classifications between [ILWU] Acting on Behalf of Locals . . . 40 . . . and [PMA] On Behalf of its Members. . . . .").

> "Their statutory obligation to represent all members of an appropriate unit requires them to make an honest effort to serve the interests of all of these members, without hostility to any." *Ford Motor Co. v. Huffman,* 345 U.S. 330, 337, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953).

A person claiming violation of this "duty of fair representation" may bring an action against the union in the district court, with jurisdiction under 28 U.S.C. § 1337 (actions arising from Acts of Congress regulating commerce). *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *Beriault v. ILWU, supra,* 501 F.2d at 263; *Retana v. Apartment, Motel, Hotel & Elevator Optrs., supra.*

■ Many cases discuss the standards for evaluating union conduct as against a claim of unfair representation. It is abundantly clear that discrimination on the basis of union membership or non-membership [8] constitutes a breach of duty of fair representation. See, e. g., *NLRB v. ILWU,* 549 F.2d 1346 (9th Cir. 1977). The issue of discrimination in this case on the basis of union status is discussed in the next section of this opinion. I first address the problem of the differing treatment of casual clerks as compared to registered clerks as a matter apart from union status.

■ The basic standard of fair representation by a bargaining agent is set out by the Supreme Court as follows:

8. Federal labor law permits the "closed shop" form of union security clause (unless state law provides to the contrary). 29 U.S.C. § 158(a)(3). In other words, the bargaining representative may negotiate for a collective bargaining agreement under which employees must join the union at or after 30 days of starting work. There are also other requirements to validate such a contractual arrangement. 29 U.S.C. §§ 158(a)(3)(A), (B).

In the present case no such union security clause is in effect. Moreover, *no* plaintiff casuals are members of the union, and essentially *all* registered A clerks are members. All parties agree that even though plaintiffs are not members of the union, they are entitled to fair representation by the bargaining representative (whether it be Local 40, the International, or both).

". . . Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. *The mere existence of such differences does not make them invalid.* The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to *complete good faith and honesty of purpose in the exercise of its discretion." Ford Motor Co. v. Huffman, supra,* 345 U.S. at 338, 73 S.Ct. at 686 (emphasis added).

This "good faith" test is simple to state but of necessity difficult to apply to concrete cases. In *Ford Motor* the Supreme Court expressly left open the question of how far a union "may go in accepting proposals to promote the long-range social or economic welfare of those it represents." 345 U.S. at 342, 73 S.Ct. at 688.

■ Later cases shed further light on the responsibilities of a union in considering and weighing the interests of the constituent classes within a bargaining unit. One point which has become clear is that it is possible for a union to take a good faith position in favor of one group of employees and against another group, even though both are part of the bargaining unit. *Humphrey v. Moore,* 375 U.S. 335, 349, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964). As the Supreme Court said,

". . . Conflict between employees represented by the same union is a recurring fact. To remove or gag the union in these cases would surely weaken the collective bargaining and grievance processes." *Id.,* 375 U.S. at 349–50, 84 S.Ct. at 372.

■ Cases from this circuit and elsewhere hold that while the duty of fair representation does not require equality of benefits (*Toensing v. Brown,* 528 F.2d 69 (9th Cir. 1975) (Skopil, D. J.)), at least "fair

consideration" must be given to the views of the minority (whether or not members of the union). *NLRB v. Teamsters,* 545 F.2d 1173, (9th Cir. 1976). Stated in other ways, the bargaining representative must have "valid reasons" for differentiating in its treatment of groups of employees. *Kling v. NLRB,* 503 F.2d 1044, 1046 (9th Cir. 1975) (Burns, D. J.). The union must try to "fairly resolve the sometimes antagonistic claims of its members." *Tedford v. Peabody Coal Co.,* 533 F.2d 952, 958 (5th Cir. 1976).

■ To summarize, the law of fair representation—and the law of the case on remand—is that defendants here may properly negotiate for and agree to contract provisions involving disparate treatment of plaintiff casual clerks (as compared to registered clerks and longshoremen) as long as such conduct is not *arbitrary* or taken in *bad faith. Beriault, supra,* 501 F.2d at 264. See also *Duggan v. IAM,* 510 F.2d 1086 (9th Cir. 1975) (Railway Labor Act). Further, the burden is on plaintiffs to prove breach of fair representation, for

"[I]t will be the *unusual case* in which hostile discrimination, bad faith, dishonesty, or arbitrary conduct can be alleged." *Retana, supra,* 453 F.2d at 1025. (emphasis added)

■ Applying a "bad faith" or "arbitrariness" standard to the evidence in this case, I find that defendants are not guilty of unfair representation to plaintiffs even though registered workers receive substantially greater benefits under the contract than do casual clerks.[9] Without attempting to comment on all of the voluminous evidence introduced on this issue by both sides, I am persuaded that work opportunities on the Portland waterfront (for clerks, and especially for longshoremen) has decreased in recent years due to growing mechanization and containerization of the cargo-handling process. I do not find it unreasonable for defendants to take steps to insure a comfortable standard of living for a large number of regular employees (registered

9. As noted *supra,* I consider separately, in the next section of this opinion, the claim that the disparities here are the result of union membership considerations. For the present, I discuss only the treatment of plaintiffs as *casuals,* versus the treatment of others as *registered* men.

clerks and longshoremen) by giving such employees high priority for the available work even though a minority of members of the bargaining unit (plaintiff casuals and others in the same position) are offered only a limited amount of work during peak periods of waterfront activity.

The cases suggest that such "discrimination" (a pejorative term) or "differentiation" (a more neutral term in the context of unfair representation claims) is common and usually legitimate. In *Conrad v. Delta Airlines,* 494 F.2d 914 (7th Cir. 1974), for example, the collective bargaining agreement denied certain grievance procedures to probationary employees even though regular employees were entitled to investigation and hearing before discharge. The Court held that such disparate treatment in and of itself was not arbitrary or irrational.

In *Cafero v. NLRB,* 336 F.2d 115 (2d Cir. 1964), the NLRB and Court considered the complaint of a worker that the union caused him to be placed at the bottom of the seniority list because he had been employed in another industry at the same time that he purported to work full time in the printing trade. Relief was denied. It is true that *Cafero* involves an employee who tried to maintain two "full-time" careers, while plaintiff casuals here are denied full-time (or even significant part-time) work as clerks. Nevertheless, I feel that the decision is applicable here in that it recognizes a policy of federal labor law that a union can reasonably seek to make limited employment opportunities to a closed group of regular, full-time workers. As noted by the Court, the policy of the union was "not inherently discriminatory" because "designed to insure that available positions in the printing trade would go to those workers in the trade who most needed the employment . . . ." *Id.,* 336 F.2d at 116–117.

To a similar effect is *Seaboard World Airlines v. Transport Workers Union,* 443 F.2d 437 (2d Cir. 1971). In that case the Court held that the union did not violate its duty of fair representation even though it negotiated a job security arrangement only

for long-time employees but not those recently hired by the employer.

In summary then, I find that the differentiations provided by the PCCCD and PCLCD do not in and of themselves reflect unfair representation of plaintiffs by defendants.

*Discrimination on the Basis of Union Membership*

As discussed above, I see no problem with the kind of differentiation by status that exists under the ILWU–PMA contract, for a bargaining representative must be allowed broad discretion in balancing the interests of its various groups of constituents.

■ I have serious problems, however, in evaluating plaintiffs' claim that the disparate contractual treatment of casual clerks results from their non-membership in the union. Such discrimination, if it exists, constitutes a most egregious sort of unfair representation and is uniformly condemned. See, e. g., *NLRB v. ILWU, supra; PMA v. NLRB,* 452 F.2d 8 (9th Cir. 1971); *NLRB v. Houston Maritime Ass'n,* 337 F.2d 333 (5th Cir. 1964); *NLRB v. National Maritime Union,* 175 F.2d 686 (2d Cir. 1949), cert. denied, 338 U.S. 954, 70 S.Ct. 492, 94 L.Ed. 589 (1950).

As discussed in footnote 8, p. 1292, *supra,* a variety of union security practices are permitted under the National Labor Relations Act. In the majority of states (such as Oregon) without "right-to-work" laws, employers and unions can contract to provide that all employees within the bargaining unit must join the union within thirty days or longer after beginning work. 29 U.S.C. §§ 158(a)(3), (b)(2). Under such a closed shop agreement, the employer can fire or take other action adverse to a non-member only if the non-membership is due to failure to pay uniformly required dues or fees. 29 U.S.C. §§ 158(a)(3)(A), (B); 158(b)(2). See *Radio Officers Union v. NLRB,* 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455 (1953).

Another common pattern is the open shop, in which all members of the bargain-

ing unit are represented by the union but may actually join or not as each worker individually elects.

A third and apparently uncommon pattern exists and applies to this case. Here, union membership is *not even available* to one group of employees. The parties stipulated that all registered A clerks become members of Local 40 and ILWU within thirty days of registration. Pretrial Order, Agreed Fact 19, at 6. Further, when I asked defendants if they agreed that union membership is not available to casuals, the response was that "defendants do not disagree with the Court's statement." Defs.Jt. Supp'l.Br. 17.

Plaintiffs have cited no authority to the effect that such a practice is *per se* a breach of duty of fair representation. What is clear, however, is that the union in such a situation must be especially careful to consider and represent the interests of non-union members of the bargaining unit. See *Thompson v. Brotherhood of Sleeping Car Porters,* 316 F.2d 191 (4th Cir. 1961); *NLRB v. National Maritime Union,* 175 F.2d 686 (2d Cir. 1949), cert. denied, 338 U.S. 954, 70 S.Ct. 492, 94 L.Ed. 589 (1950).

Resolving this issue has been especially difficult in this case. There is substantial evidence to support the position of either side.

On behalf of plaintiffs, for example, there is strong circumstantial evidence of discrimination on the basis of union membership—the undisputed fact that no casuals have been permitted to join the union. This situation, while not *per se* a breach of fair representation, is certainly suspicious and suggestive of an unwillingness to give reasonable consideration to the interests of plaintiff casuals. Equally suggestive are the gross disparities in work opportunity and other benefits between registered (union) and casual (non-union) workers. Further, the record discloses a very few instances of anti-casual sentiment expressed by various Local 40 officers.

After long and careful consideration of all the evidence, however, I find that plain-

tiffs have not met their burden of proof in establishing any breach of duty of fair representation by defendants in negotiating the collective bargaining agreements. Rather, I am persuaded that the discrepancies in benefits afforded to the different groups of workers are not the function of union membership or non-membership but reflect good faith efforts to distribute the available work opportunity among a majority of members of the bargaining unit. See discussion *supra.*

The evidence shows that registration—with its attendant advantages—is not a consequence of or reward for union membership. Rather, most members of Local 40 were accepted for membership in the union only after their registration was approved. The reduced benefits received by plaintiffs are a consequence of their status as *casuals* rather than a consequence of their status as *non-members* of defendants.

It should also be noted that despite the relative lack of contractual benefits enjoyed by casual clerks, they are entitled to some significant privileges which were bargained for them by defendants. Among these privileges are equal hourly and overtime pay rates (not dependent on status or prior experience) as registered men, four-hour minimum shifts in many situations, and other benefits. Finally, the evidence shows that many casual clerks over the years have not been regularly available for work on the waterfront but rather have taken full-time and part-time work in other industries.

In view of all these factors, I find that the contracts negotiated by defendants do not reflect any breach of duty of fair representation owed to plaintiffs. Plaintiffs should not conclude from this that I approve of the practice of excluding plaintiffs from union membership. Rather, I agree with plaintiffs that the practice is strong evidence of unfair representation. As a personal matter, I strongly disapprove of it. Nevertheless I conclude, in this very close case, that defendants should prevail.

This opinion contains findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## CONCLUSION

The Clerk is directed to enter judgment dismissing this action, each party to bear its own costs.   See Fed.R.Civ.P. 55(d).