**George R. WILLIAMS et al.,**
**Plaintiffs-Appellants,**

v.

**PACIFIC MARITIME ASSOCIATION et**
**al., Defendants-Appellees.**

No. 77–1398.

United States Court of Appeals,
Ninth Circuit.

Feb. 8, 1980.

Rehearing Denied May 13, 1980.

was correct in concluding that there was no breach of the duty of fair representation. Accordingly, we affirm the judgment.[1]

Arthur Brunwasser, San Francisco, Cal., argued, for plaintiffs-appellants.

Lillick McHose & Charles, Gary J. Torre, Norman Leonard of Leonard & Patsey, Richard Ernst of Ernst & Daniels, San Francisco, Cal., argued; Gladstein, Andersen, Leonard & Sibbett, Kendall W. De Bevoise, Ernst & Daniel; San Francico, Cal., on brief, for defendants-appellees.

Before DUNIWAY and KENNEDY, Circuit Judges, and BONSAL,[*] District Judge.

KENNEDY, Circuit Judge:

This appeal is from an order of the district court dismissing several claims due to appellants' failure to exhaust contractual remedies, and finding that appellees Pacific Maritime Association (PMA) and the International Longshoremen's and Warehousemen's Union (ILWU) and ILWU Local 10 did not breach a duty of fair representation owed to appellants. We have jurisdiction under 28 U.S.C. § 1291. We disagree with the trial court on the initial question of exhaustion of remedies, but we rule that it

I

Facts Underlying The Dispute

Appellants are former limited registration Class B longshoremen employed by PMA, an organization of steamship, stevedoring, and terminal companies doing business on the Pacific Coast. The ILWU is the exclusive bargaining representative of longshoremen in the area. Local 10 is the ILWU's constituent local in the Port of San Francisco.

PMA, and the ILWU are parties to a collective bargaining agreement covering substantially all longshore work on the Pacific Coast.[2] Under that agreement, a Joint Port Labor Relations Committee (the "Port Committee"), made up of representatives of PMA and ILWU Local 10, maintained a central dispatching hall for the hiring and dispatching of all longshoremen at the Port of San Francisco. The agreement provided for two classes of longshoremen, the preferred employees, called Class A, and the limited registered longshoremen, Class B. In operating the hiring hall, the Port Committee distributed work among longshoremen according to their registered status. Fully registered Class A longshoremen received priority for available work. Class B longshoremen had limited rights to available work, were subject to stricter rules and more stringent penalties than were applica-

---

[*] The Honorable Dudley B. Bonsal, United States District Judge for the Southern District of New York, sitting by designation.

[1.] This court has confronted issues involved in this case on two previous occasions. In *Williams v. Pacific Maritime Ass'n*, 384 F.2d 935 (9th Cir. 1967), *cert. denied*, 390 U.S. 987, 88 S.Ct. 1181, 19 L.Ed.2d 1290 (1968), we reversed a summary judgment for defendants and ordered a trial. In *Williams v. Pacific Maritime Ass'n*, 421 F.2d 1287 (9th Cir. 1970), we sustained rulings dismissing the individual defendants and claims for punitive and exemplary damages.

[2.] PMA signed a succession of collective bargaining agreements with the ILWU and Local 10. At the time of this suit an agreement was in effect covering the period June 16, 1961 to July 1, 1966. Rules relating to registration and deregistration of longshoremen in the Port of San Francisco, adopted about March 18, 1958, were a part of that agreement, and remained in effect until new rules were adopted about June 17, 1963.

ble to Class A workers, and were ineligible for membership in Local 10. Each worker paid a pro rata share of the cost of running the hiring hall.

The agreement provided that Class B workers could apply periodically for promotion to Class A status. At such times, the Port Committee would review the record of the Class B worker and decide whether to grant or deny his promotion or to discharge him entirely. Class B longshoremen could be deregistered at any time for "cause." The causes were not exhaustively enumerated but included pilferage, intoxications, assault, unexcused failures to be ·available for work, and dropping hours from time sheets or "chiseling." [3] In essence, this system had been in effect since 1934, when longshoring was primarily a labor intensive industry in which the workers manually moved cargo to and from ships. Gradually, economic pressures forced the industry to mechanize. Mechanization required a shift in the work force. It demanded fewer but more highly skilled laborers to operate sophisticated, expensive machinery. *See generally, New York Shipping Ass'n v. Federal Maritime Comm'n*, 187 U.S.App.D.C 282, 285, 571 F.2d 1231, 1234 (D.C.Cir.1978); *Pacific Maritime Ass'n (Johnson Lee)*, 155 N.L. R.B. 1231, 1233 (1965).

To meet the needs of the industry, PMA and the ILWU agreed early in 1963 to transfer 400 to 450 of the approximately 530 limited registered Class B longshoremen to Class A status and to eliminate the Class B list and deregister all other existing Class B longshoremen. Implementing this decision, the Union and PMA jointly adopted the following standards to guide their selection of the most qualified persons for transfer.

1. Any Class "B" longshoreman found to have 10 or more hours of Low-Man-Out violations shall be considered ineligible for advancement to Class "A" registration.

2. Any Class "B" longshoreman found to have been late in the payment of his pro rata eight or more times (or six or more times with an otherwise blemished record) shall be considered ineligible for advancement to Class "A" registration.

3. Any Class "B" longshoreman found to have failed to meet the 70% availability requirement for any 30-day period shall be considered ineligible for advancement to Class "A" registration.

4. Any Class "B" longshoreman who has been the subject of one or more employer complaints for intoxication or pilferage that the Joint Port Committee has sustained shall be considered ineligible for advancement to Class "A" registration.

5. The standards shall be applied uniformly and no exceptions shall be made.

On June 17, 1963, a few weeks after adopting the new standards, the Port Committee promoted 448 Class B longshoremen to Class A status and ordered the deregistration of all other existing Class B longshoremen, including the appellants, who were notified of their immediate and summary deregistration. The notices did not state the specific infractions that brought about each deregistration, but advised each individual that he had a right to file a grievance with the Port Committee. Until the date they were deregistered all appellants were, and had been for at least four years, registered in Class B and in good standing.

All but two of the appellants and several other deregistered Class B longshoremen

---

**3.** The collective bargaining agreement adopted a "low-man-out" ("LMO") system of dispatch, under which longshoremen with the fewest hours of work in a given pay period were dispatched before those who had worked more hours. *See* Pacific Coast Longshore Agreement § 8.42. This system was designed to equalize work opportunities among longshore-

men. It depended on an honor system in which each longshoreman was responsible for accurately reporting the hours he worked. If an individual signed in with fewer hours than he actually. had worked he gained an advantage over others in the dispatch. This practice was referred to as "signing in as low," "dropping hours," and "chiseling."

requested a hearing by the Port Committee regarding the grounds for the deregistrations. At those hearings, Port Committee representatives notified each longshoreman of the reason he was deregistered and gave each the opportunity to challenge the factual basis for the discharge. Thereafter, the Port Committee conferred with individual longshoremen to establish and document the infractions leading to their deregistrations. With few exceptions there was no dispute over the underlying facts. Rather, the deregistered longshoremen vainly attempted to challenge the standards for dismissal, alleging that the new rules were not reasonably related to the needs of the industry in 1963 and were arbitrary, capricious and unfair, particularly as they were applied retroactively and to conduct that was not a violation of any rule when it occurred.

At the conclusion of the hearings, the Port Committee reinstated four B men whose deregistrations had been based on mistakes of fact, and affirmed the deregistrations of the appellants. The Committee notified each longshoreman whose deregistration had been sustained that he could file a discrimination grievance under the collective bargaining agreement that would institute a collateral attack on the decision sustaining his deregistration.

Section 17 of the Pacific Coast Longshore Agreement created an exclusive, if somewhat complex, mechanism for resolution of disputes arising under the contract. It provided for a series of joint labor relations committees to adjudicate disputes: a joint port committee, a joint area committee, and a joint coast committee. These committees were composed of three or more representatives designated by the union and three or more representatives designated by the employer with each side of the committee having equal vote.

Section 17.15 outlines the grievance procedure for disputes between labor and management.[4] The Port Committee first investigates the dispute and tries to agree on an appropriate resolution.[5] If the union and management sides of the committee cannot agree, the dispute proceeds to the Joint Area Committee for resolution.[6] If the members of the Area Committee also fail to agree on a disposition, the dispute proceeds to an Area Arbitrator for resolution.[7]

4. 17.15 The grievance procedure of this Agreement shall be the exclusive remedy with respect to any disputes arising between the Union or any person working under this Agreement or both, on the one hand, and the Association or any employer acting under this Agreement or both, on the other hand, and no other remedies shall be utilized by any person with respect to any dispute involving this Agreement until the grievance procedure has been exhausted.

5. 17.2 Grievances arising on the job shall be processed in accordance with the procedure hereof beginning with 17.21. Other grievances as to which there are no specific provisions herein shall be processed in accordance with the provisions hereof beginning with 17.23.

17.21 The gang steward and his immediate supervisor, where the grievance is confined to one gang, or any one steward who is a working member of an affected gang where the grievance involves more than one gang or a dock operation, shall take the grievance to the walking boss, or ship or dock foreman in immediate charge of the operation.

17.22 If the grievance is not settled as provided in 17.21, it shall be referred for determination to an official designated by the Union and to a representative designated by the Employer.

17.23 *If the grievance is not settled in 17.21 and 17.22 or does not arise on the job, it shall be referred to the Joint Port Labor Relations Committee which shall have the power and duty to investigate and adjudicate it.* (Emphasis added).

6. 17.24 In the event that the Employer and Union members of any Joint Port Labor Relations Committee shall fail to agree upon any question before it, such question shall be immediately referred at the request of either party to the appropriate Joint Area Labor Relations Committee for decision.

7. 17.25 In the event that the Employer and Union members of any Joint Area Labor Relations Committee fail to agree on any question before it, such question shall be immediately referred at the request of either party to the Area Arbitrator for hearing and decision, and the decision of the Area Arbitrator shall be final and conclusive except as otherwise provided in 17.26.

If the Port or Area Committee does come to a decision, either party may appeal the decision to the Coast Committee.[8] If the two sides of the Coast Committee fail to agree, the dispute is resolved by a Coast Arbitrator.[9] If the parties to the dispute claim that the decision of the Port or Area Committee conflicts with a provision of the collective bargaining agreement, the appeal to the Coast Committee is a matter of right. On the other hand, if the dispute involves operation of the hiring hall, interpretation of dispatching rules, pay or discharges, it is a matter for the Coast Committee's discretion whether to accept the appeal.[10]

Section 17.4 of the agreement provides a separate procedure whereby an individual longshoreman may bring a claim of discrimination by the union or his employer under section 13 of the collective bargaining agreement. Section 13 prohibits discrimination against any longshoreman on the basis of race, creed, color, national origin, religious or political beliefs, membership or nonmembership in the union, or activity for or against the union.[11] An allegation of a section 13 violation also begins with the filing of a grievance with the Port Committee. The longshoreman may appeal any decision of the Port Committee to the Coast Committee, and any decision of the Coast Committee to the Coast Arbitrator.

The collective bargaining agreement contains no other provisions for resolution of disputes.

In late July, 1963, most of the appellants and several other Class B longshoremen whose deregistrations had been sustained filed grievances with the Port Committee under section 17. Although the written complaints of the deregistered longshore-

---

**8.** 17.26 The Joint Coast Labor Relations Committee has jurisdiction to consider issues that are presented to it in accordance with this Agreement and shall exercise such jurisdiction where it is mandatory and may exercise it where such jurisdiction is discretionary as provided in 17.261, 17.262 and other provisions of this Agreement.

17.261 Any decision of a Joint Port or Joint Area Labor Relations Committee or of an Area Arbitrator claimed by either party to conflict with this Agreement shall immediately be referred at the request of such party to the Joint Coast Labor Relations Committee (and, if the Joint Coast Labor Relations Committee cannot agree, to the Coast Arbitrator, for review). The Joint Coast Labor Relations Committee, and if it cannot agree, the Coast Arbitrator, shall have the power and duty to set aside any such decision found to conflict with this Agreement and to finally and conclusively determine the dispute. It shall be the duty of the moving party in any case brought before the Coast Arbitrator under the provisions of this 17.261 to make a prima facie showing that the decision in question conflicts with this Agreement, and the Coast Arbitrator shall pass upon any objection to the sufficiency of such showing before ruling on the merits.

**9.** 17.27 In the event that the Employer and Union members of the Joint Coast Labor Relations Committee fail to agree on any question before it, including a question as to whether the issue was properly before the Coast Labor Relations Committee, such question shall be immediately referred at the request of either party to the Coast Arbitrator for hearing and decision, and the decision of the Coast Arbitrator shall be final and conclusive.

**10.** 17.262 The Joint Coast Labor Relations Committee and the Coast Arbitrator shall have power to review decisions relative to the operation of dispatching halls, or the interpretation of port working and dispatching rules, or discharges, or pay (including travel pay and penalty rates), *but shall exercise it in any case only if the Committee decides to review the specific case.* (Emphasis added).

**11.** Section 13 provides:

There shall be no discrimination in connection with any action subject to the terms of this Agreement either in favor or of against any person because of membership or nonmembership in the Union, activity for or against the Union or absence thereof, or race, creed, color, national origin or religious or political beliefs.

Under section 17.4:

When any longshoreman (whether a registered longshoreman or an applicant for registration or a casual longshoreman) claims that he has been discriminated against in violation of Section 13 of this Agreement, he may at his option and expense, or either the Union or the Association may at its option and at their joint expense, have such complaint adjudicated hereunder, which procedure shall be the exclusive remedy for any such discrimination.

men contained no references to violations of section 13, the Port Committee treated the grievances as section 17.4 complaints, alleging discrimination under section 13. About the same time most of the appellants also entered into state court litigation to recover California unemployment insurance benefits denied by the state unemployment insurance board. The Port Committee decided to postpone consideration of the section 17.4 appeals until the unemployment insurance hearings were concluded. The unemployment insurance referee finished taking evidence on April 1, 1964.

On April 15, 1964, nearly nine months after bringing their grievances to the Port Committee and before the Port Committee had begun to consider the claims, appellants filed their complaint in this matter. They alleged that they already had attempted to exhaust the grievance arbitration procedure and prayed that the necessity for further resort to the grievance procedure be enjoined. After appellants filed suit, and following the conclusion of testimony in the unemployment insurance cases, the Port Committee on May 18, 1964, made its first response to appellants' July 23, 1963 letters, advising appellants that it was treating the letters as section 13 grievances and notifying them that grievance hearings soon would be scheduled.

The district court denied appellants' request for a preliminary injunction against further administrative procedures. The Port Committee then considered appellants' claims and held that they had failed to allege a violation of section 13. An appeal to the Coast Committee was similarly unsuccessful, the committee members agreeing that appellants failed to allege a breach of section 13. Appellants did not attempt to appeal further to the Coast Arbitrator.

The district court concluded that the deregistered longshoremen were "not entitled to relief in this court with respect to their deregistration because they failed and refused to exhaust the grievance arbitration procedure of the ILWU–PMA Contract, which they could have exhausted by taking their grievances to the Coast Arbitrator after receiving the notices of the decision of the Coast Labor Relations Committee on November 20, 1964." Appellants challenge the district court's holding, alleging that they have exhausted available remedies or, in the alternative, that further grievance procedures should be excused as futile. We agree.

## II

### Exhaustion of Remedies

Appellants' complaint combined two distinct claims. In one they alleged that in agreeing to the rules under which the appellants were deregistered, the union breached its duty to represent fairly all employees in the unit. In the other they contended that in discharging appellants under the new rules the employer and the union breached the collective bargaining agreement. The former is based on the statutory duty of fair representation, the latter on the terms of the contract. Although the two claims are intertwined, the exhaustion considerations for each are somewhat different and will be treated separately.[12]

### A. Breach of the Collective Bargaining Agreement

It is a well-established principle of labor law that a union and its members must attempt to exhaust the exclusive remedies provided in their collective bargaining agreement with the employer before they seek judicial intervention for breach of the agreement. *See Vaca v. Sipes,* 386 U.S.

12. Appellees apparently do not allege that the employees failed to exhaust contractual remedies with respect to their breach of contract claim. They only contend that the employees unreasonably failed to exhaust remedies for the alleged breach of the duty of fair representation. Because the two claims were not explicitly separated until trial, however, we discuss exhaustion in both contexts.

171, 184, 87 S.Ct. 903, 913, 17 L.Ed.2d 842 (1967); *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652–53, 85 S.Ct. 614, 616, 13 L.Ed.2d 580 (1965); *United Steelworkers v. American Manufacturing Co.*, 363 U.S. 564, 566, 80 S.Ct. 1343, 1345, 4 L.Ed.2d 1403 (1960). All parties apparently agree that appellants fully exhausted their remedies for the contractual grievance. Section 17.-15 of the Pacific Coast Longshore Agreement governs disputes such as this one alleging breach of the collective bargaining agreement, which arise between "any person working under this Agreement . . on the one hand, and the Association or any employer acting under this Agreement or both, on the other hand." Appellants complied with section 17.15 by appealing the unanimous decision of the Port Committee to the Coast Committee and that decision was unanimously affirmed. No further avenue of review is available for a contractual grievance under section 17.15.

### B. Breach of the Duty of Fair Representation

■■■ The heart of the employees' claim of unfair representation is that the union breached its statutory duty to plaintiffs by agreeing to the adoption of the 1963 standards for deregistration. Claims alleging breach of the duty of fair representation in *negotiating* the collective bargaining agreement are not subject to the exhaustion re-

quirement. *Beriault v. Local 40, ILWU*, 501 F.2d 258, 266 (9th Cir. 1974). *Cf. Czosek v. O'Mara*, 397 U.S. 25, 27–28, 90 S.Ct. 770, 772, 25 L.Ed.2d 21 (1970) (suit against union for breach of duty of fair representation in processing grievance not subject to ordinary rule that administrative remedies should be exhausted before resort to the courts); *Glover v. St. Louis-S. F. Ry.*, 393 U.S. 324, 329–31, 89 S.Ct. 548, 551–52, 21 L.Ed.2d 519 (1969); *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In *Beriault*, which also involved the ILWU contract, this court reasoned that "[t]he failure to exhaust grievance procedures is of no consequence as to these claims because plaintiffs seek modification of the contract, a remedy not available through the grievance procedure." *Beriault v. Local 40, ILWU*, 501 F.2d at 266. Although the claimed breach in the instant case involves negotiation of working rules rather than contract provisions, we think the same reasoning applies. As discussed below, the working rules were negotiated pursuant to provisions of the collective bargaining agreement permitting such alterations. Once approved, the alterations were incorporated into and for exhaustion purposes became part of the collective bargaining agreement. Because such claims are not subject to exhaustion, appellants are not barred from judicial review.[13] *See also Vaca v. Sipes*, 386 U.S. 171, 186, 87 S.Ct.

---

13. Even if the principles of *Beriault* were not applicable, we have doubts regarding appellees' exhaustion defense. The exhaustion requirement is "subject to a number of exceptions for the variety of situations in which doctrinaire application of the exhaustion rule would defeat the overall purposes of federal labor relations policy." *Glover v. St. Louis-S. F. Ry.*, 393 U.S. 324, 329–31, 89 S.Ct. 548, 551, 21 L.Ed.2d 519 (1969). *Accord, Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). *See* Simpson & Berwick, Symposium—Exhaustion of Grievance Procedures and the Individual Employee, 51 Tex.L.Rev. 1179, 1210–13 (1973).

In the instant case, it is doubtful that the arbitrator could have granted the relief requested, since under the collective bargaining agreement the arbitrator's powers were "limited strictly to the application and interpretation of the agreement as written." Pacific Coast

Longshore Agreement § 17.52. . He apparently did not have the power to set aside rules adopted under the contract. *Cf. Hotel and Restaurant Employees v. Michelson's Food Services, Inc.*, 545 F.2d 1248, 1253 (9th Cir. 1976) (party not required to submit unfair representation claim to arbitration absent the contract's manifestation of a clear, unequivocal intent to require such arbitration). *Accord, Desrosiers v. American Cyanamid Co.*, 377 F.2d 864, 870–71 (2d Cir. 1967); *Hiller v. Liquor Salesmen's Union, Local No. 2*, 338 F.2d 778 (2d Cir. 1964).

There is, further, a strong indication that the grievance machinery was unreasonably delayed. The requirement of exhaustion is bottomed on the assumption that the grievance procedure is plain, speedy and adequate. *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652–53, 85 S.Ct. 614, 616, 13 L.Ed.2d 580 (1965). The inaction of the Port Committee for

903, 914, 17 L.Ed.2d 842 (1967); *Margetta v. Pam Pam Corp.,* 501 F.2d 179, 180 (9th Cir. 1974).

We recognize that appellees assumed and the district court apparently agreed that the longshoremen were basing their claims only on section 13 of the agreement. Claims based on section 13 must proceed by way of the grievance procedures outlined in section 17.4. These procedures are somewhat different from those provided in section 17.15 and would have required the longshoremen to appeal finally to the Coast Arbitrator. However, the assumption that the longshoremen were basing their claims on section 13 is erroneous.

Nothing in section 13 suggests an effort to prohibit misconduct such as that of which

almost nine months and its failure to inform appellants of the reasons for the delay make appellants' attempts to invoke the grievance mechanism sufficient to satisfy the exhaustion requirement. *See Seay v. McDonnell Douglas Corp.,* 427 F.2d 996, 1001–02 (9th Cir. 1970).

Finally, employees alleging unfair representation by their union in collusion with management are not required to submit their controversy to a group that in large part is chosen by the defendants against whom their real complaint if made. *Glover v. St. Louis-S. F. Ry.,* 393 U.S. 324, 330–31, 89 S.Ct. 548, 551–52, 21 L.Ed.2d 519 (1969). Those persons representing PMA and the ILWU during the grievance proceedings had either participated in deregistering the appellants or had voiced opinions on their cases. It is unlikely that such persons could be entirely fair and impartial. This lack of neutrality in the adjudicating bodies renders exhaustion of remedies futile. *See generally, NLRB v. Industrial Union of Marine and Shipbuilding Workers,* 391 U.S. 418, 426 n.8, 88 S.Ct. 1717, 1723, 20 L.Ed.2d 706; *Petersen v. Rath Packing Co.,* 461 F.2d 312, 315 (8th Cir. 1972); *Lusk v. Eastern Products Corp.,* 427 F.2d 705, 708 (4th Cir. 1970); *Desrosiers v. American Cyanamid Co.,* 377 F.2d 864 (2d Cir. 1967).

14. Appellants first invoked the grievance mechanism by letters dated July 27, 1963. All the longshoremen sent identical copies of the following form letter:

Dear Sirs:

Your committee de-registered me on June 17. On July 24, I received your letter denying my hearing appeal. In so doing you consummated an action that is discriminatory. You have not judged all the men involved by the same standards.

appellants complain. That section was explicitly limited to claims based on race, creed, color, sex, national origin, religious beliefs, political beliefs, membership or non-membership in the union, and activity for or against the union. The longshoremen's contentions do not fit any of the above categories.

Furthermore, it is quite clear that no one actively involved in administering the collective bargaining agreement during 1963–64 believed that the appellants' claims even arguably fell within the scope of section 13. The employees did not raise section 13 in their grievances.[14] Moreover, the members of both the Port Committee and the Coast Committee unanimously agreed that the

I appeal your decision and request another hearing as stipulated, where I will prove and document this discrimination.

I have never been able to get from you an official statement specifying the alleged charges against me, nor did your committee produce documents to substantiate the charges.

Would you please correct this situation for the next hearing.

Nowhere does the letter refer to section 13 in general or to individual violations of that section in particular. The complaints simply allege that plaintiffs were "deregistered" as Class B longshoremen in "an action that is discriminatory." *See Williams v. Pacific Maritime Ass'n,* 384 F.2d 935, 941 (9th Cir. 1967). The letters recited that the 1963 standards were unfair because they applied to conduct or acts that had occurred before adoption of the 1963 standards. The longshoremen had made this point in earlier hearings before the Port Committee.

It was not until the longshoremen received the Port Committee's first response to the letters nine months later that they learned that the Committee had construed the claims as attempts to allege discrimination under section 13. In denying relief, however, both the Port Committee and the Coast Committee (as well as the longshoremen themselves) unanimously agreed that the claim did not fall within the scope of section 13. It appears that the Committee placed the breach of contract claim in the wrong pigeonhole to begin with and then disposed of the matter by saying that the wrong classification barred consideration of the claim.

employees' claims did not allege section 13 type discrimination.[15] We must conclude from this that appellants' suit does not raise section 13 type issues and, therefore, is not subject to the exhaustion requirements of section 17.4.

### III

### Duty of Fair Representation

The substance of appellants' suit is that the ILWU breached its duty of fair representation to appellants in negotiating the standards under which appellants were discharged. This contention divides into two parts: first, that it was impermissible for the union to treat the B men differently than the fully registered Class A longshoremen; second, that the terms negotiated were arbitrary, were unrelated to the ability to perform longshore work, and constituted *ex post facto* punishment for infractions already atoned for. Both contentions are without merit.

 The premise that the union breached its duty of fair representation in agreeing to terms permitting preferential treatment for Class A workers runs throughout appellants' brief and is stated most succinctly in the assertion that "the creation and maintenance of the Class B list was *per se* unlawful." To the contrary, however, the law of fair representation clearly permits a union to negotiate for and agree to contract provisions involving disparate treatment of distinct classes of workers (here provisional workers as compared to fully registered longshoremen) as long as such conduct is not arbitrary or taken in bad faith. *See Ford Motor Co. v. Huffman,* 345 U.S. 330, 338–39, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953); *Dugan v. IAM,* 510 F.2d 1086 (9th Cir.), *cert. denied,* 421 U.S. 1012, 95 S.Ct. 2417, 44 L.Ed.2d 680 (1975); *Beriault v. Local 40, ILWU,* 501 F.2d 258 (9th Cir. 1974).[16]

Applying the "bad faith or arbitrariness" standard, we conclude that the appellees are not guilty of unfair representation to the appellants even though fully registered workers received substantially greater benefits under the contract than did probationary Class B workers. The historical reasons for the creation and maintenance of the limited registration Class B list have been noted above, and they clearly demonstrate that a rational basis existed for the distinction between those in the two seniority classes. The unique needs of the industry convince us that it was not only lawful but necessary for the union to take a good faith position favoring better terms and conditions for one group of employees than for another. As Judge Skopil said when, as a district court judge, he dealt with an identical contention directed to registered and casual lists in the Pacific Coast longshore industry:

> That is in command or in charge of the Committee down below. You should understand that.
> (Emphasis added).

---

**15.** Both PMA and ILWU officials understood that section 13 was limited to its literal meaning. For example, ILWU President Harry Bridges explained to one of the deregistered workers before the Coast Commission that the grievance procedure under section 13 was designed only to determine if there was discrimination within the literal language of that contractual provision:

> Mr. Bridges: I think we should tell you, Mr. Love, that in terms of pro rata and those other items, they are determined at the lower level. We don't review them up here in the nature of an appeal. Now, the only thing we look into up here is if there is a charge that you have been improperly dealt with under Section 13 of the Contract, which I have just read, which can be racial, political or religious discrimination. On the matter of low man out or pro rata, *we don't consider that.*

**16.** Plaintiffs also appear to contend that disparate contractual treatment of Class B Workers resulted from their nonmembership in the union. The record in this case does not support plaintiffs' contention. Most of the nonunion members of Class B received a clear benefit from the 1963 negotiations, namely, a promotion to Class A status. Those who were denied that promotion were denied it on objective and reasonable grounds. There was no distinction between those promoted and those deregistered in terms of union membership. *See Beriault v. Local 40, ILWU,* 445 F.Supp. 1287, 1295 (D.Or.1978).

I do not find it unreasonable for defendants to take steps to insure a comfortable standard of living for a large number of regular employees (registered clerks and longshoremen) by giving such employees high priority for the available work even though a minority of members of the bargaining unit (plaintiff casuals and others in the same position) are offered only a limited amount of work during peak periods of waterfront activity.

*Beriault v. Local 40, ILWU*, 445 F.Supp. 1287, 1293–94 (D.Or.1978). *Accord, Pacific Maritime Ass'n (Johnson Lee)*, 155 NLRB 1231, 1234 (1965); *International Longshoremen's and Warehousemen's Union v. Waterfront Employers' Ass'n*, 90 NLRB 1021, 1023 (1950).

Appellants also contend that the union breached its duty of fair representation when it agreed to adopt the 1963 standards under which appellants were deregistered. The premise underlying this contention is that it was unlawful for the ILWU and PMA to agree to review the record of a longshoreman's conduct as a Class B limited registration longshoreman at the time when he would be considered for promotion to Class A full registration status. Appellants urge that a failure to discipline or the imposition of discipline less than deregistration following each infraction barred subsequent consideration of the misconduct in determining whether or not the man would continue to be a longshoreman and so be promoted to Class A full registration status. We conclude, however, that in adopting and implementing the 1963 standards the union acted neither arbitrarily nor in bad faith.

■ It is necessary at the outset to dispel the notion that in adopting the 1963 standards for deregistration the appellees violated their duty to provide notice of the conditions under which the employees could be discharged. Appellants claim that the union violated a fiduciary duty owed to appellants when it approved retroactive application of new rules and penalties by PMA and the ILWU without prior notice to the appellants. It is true that the duty of fair representation requires the union to explain to members of the bargaining unit their rights and duties under the collective bargaining agreement. *See Retana v. Apartment, Motel, Hotel, and Elevator Operators Union, Local No. 14*, 453 F.2d 1018 (9th Cir. 1972); *Brady v. Trans World Airlines, Inc.*, 401 F.2d 87 (3d Cir. 1968), *cert. denied*, 393 U.S. 1048, 89 S.Ct. 680, 21 L.Ed.2d 691 (1969). We are convinced, however, that the union supplied the employees with repeated and adequate warning that the misconduct of which they were found guilty could be the basis for their failure to advance to Class A status. The 1958 "Memorandum of Rules Regarding Registration and De-Registration of Longshoremen in the Port of San Francisco" ("1958 Rules") set out the procedure for bringing new men into registration status as Class B limited registration longshoremen, the powers reserved as to deregistration of these men, the procedure under which men in that status would be promoted to Class A full registration status, and the provisions for a full review of the man's record when his trial period was being terminated.[17] Section 9 of the 1958 Rules provided:

> 9. De-Registration of Limited Registration (Class B) Longshoremen.
>
> (a) *A Class B longshoreman . . . may be de-registered for cause by the Joint Labor Relations Committee (in accordance with such rules or uniform procedures as may be established or followed by such Committee) if the Committee finds:*
>
> [(i–x) any of ten types of misconduct or inadequacy for the job of longshoreman] . . .
>
> (xi) Or for any other cause; provided that neither membership or nonmembership in the union nor activity or nonactivity for or against the union,

17. *See* 1958 Rules, § 8.

shall be a factor in considering applications for registration or in de-registration.

(Emphasis added). The meaning of this provision was brought home to longshoremen applying in 1958 for positions as Class B workers. The application form prepared by the parties emphasized that the privileges of registration could be withdrawn pursuant to rules then in existence or later agreed to in collective bargaining. A letter of explanation that accompanied each application form stated that the applications and the jobs would be subject to the 1958 Rules, and it directed each person to "read the box at the end carefully" warning that it "states the conditions under which your application will be received." Paragraph 4 in the box read:

> Class "B" registration, if granted, shall be subject to agreements between the PMA and ILWU, or their successors, and to *rules with respect to registration and deregistration* established by said parties; I understand that registered longshoremen may be deregistered and that *registration may be revoked in accordance with such agreements and such rules now in effect or hereafter to be agreed upon or adopted* by the Association and the Union or their successors or by the Joint Port Labor Relations Committee.

(Emphasis added). Additional disclosure was made in subsequent letters.

The record establishes, moreover, that even before the 1963 standards for admission to Class A status were negotiated, the appellants understood that the actions for which they ultimately were deregistered constituted misconduct. Each action was specifically prohibited by the collective bargaining agreement or by various working rules adopted by the Joint Labor Committees. The rules of conduct adopted by the Port Committee in 1959 specifically spelled out the obligation of the Class B men to maintain a 70 per cent availability record. This *obligation was driven home to the* longshoremen in a letter sent to each call-

ing attention to the 70 per cent requirement. Intoxication and pilferage were explicitly prohibited by sections 17.81, 17.82, and 17.823 of the Pacific Coast Longshore Agreement. Longshoremen were admonished several times against late payment or nonpayment of pro rata charges, most notably in letters sent to each worker applying for Class B status. The rule against dropping LMO hours was well known as part of the common law of the shop, and each of the appellants testified he knew that there was a rule against chiseling and that "dropping LMO hours" was misconduct. Other warnings to longshoremen not to engage in such misconduct abound in the record.

Any of the four activities that became the basis for deregistration in 1963 was understood to constitute failure to abide by the "rules and determinations of the Joint Labor Relations Committee," which "can be cause for suspension or loss of registration." Thus, there were no new rules retroactively turning permitted actions of the appellants into misconduct. The actions found to be cause for deregistration were all misconduct under Port Committee rules in effect throughout the period of appellants' registration. This fact and the observation that appellants were warned repeatedly that their records would be reviewed upon their consideration for advancement to Class A status are sufficient to support the district court's conclusion that the union did not breach a duty to warn of conduct that might lead to deregistration.

Turning to the standards themselves, we agree with the district court that they were negotiated in good faith and were neither arbitrary nor irrational. As we observed earlier, the differential treatment accorded the B men was necessitated by the inevitable change in the nature of the longshore industry.

The same considerations that resulted in the 1958 Rules establishing the bifurcated system of A and B men also gave rise to the 1963 standards for deregistration or advancement to Class A status. By Septem-

ber 1962, the Coast Committee had come to an agreement that the parties should move toward lifting the freeze on promotion of B men to A status, and PMA had obtained a commitment from the ILWU that as a condition of lifting the freeze there should be an upgrading of the longshore work force as part of the program for selecting limited registration B men for promotion. The record supports the district court's findings that the conduct of both the ILWU and its Local 10 in the negotiations leading to the explicit promotion standards was carried on with motives only of good faith and honesty, in an effort to reach the best agreement for the unit as a whole, and without in any way sacrificing the meritorious positions of any of the individuals in the bargaining unit. In negotiating contract terms, a union often confronts the task of representing employees who have different, often competing, interests. In representing the unit as a whole, the union may agree to terms favorable to some employees and unfavorable to others, provided it acts in good faith. *See, e. g., Lusk v. Eastern Products Corp.,* 427 F.2d 705 (4th Cir. 1970). *See generally, J. I. Case Co. v. NLRB,* 321 U.S. 332, 338–39, 64 S.Ct. 576, 580–81, 88 L.Ed. 762 (1944). In this case, the criteria by which appellants were deregistered represent such an accommodation. The mere differential effect of these standards does not in itself support a finding that the standards were negotiated in bad faith.

■ Neither the ILWU nor Local 10 conducted collective bargaining in an improper manner. In the spring of 1963, the parties reached agreement on the four explicit promotion standards enumerated above. We conclude, as did the district court, that the four substantive standards were neither arbitrary nor irrational. Rather, each is justifiable as relevant to the qualifications for employment as a Class A longshoreman.[18]

*Late payment of pro rata.* As the NLRB concluded on this very issue, it is not irra-

tional or capricious to believe that one who is lax in meeting his obligations to his fellows to share the costs of the dispatching hall may not develop into a conscientious and reliable worker. *Pacific Maritime Ass'n (Johnson Lee),* 155 N.L.R.B. 1231, 1234 (1965).

*Chiseling.* A record of dropping low-man-out hours also indicates that an individual's promotion to permanent status will not contribute to upgrading the work force. An individual caught more than once chiseling on an honor system does not present a convincing portrait of one who will improve the work force. This is particularly true where, as here, there was little apparent chiseling in the entire group of Class B workers.

*Availability.* Similarly, it is reasonable and logical to assume that one who has a record of poor availability when work is relatively scarce will not help meet the need for a steady, permanent work force.

*Employer complaints.* Appellants allege that because the men deregistered for employer complaints of intoxication (or involvement in a work stoppage where alcohol was a factor) were very careful after returning from suspension not to be involved in any subsequent incidents, the complaints on their records have no significance regarding their qualifications as Class A workers. The observation that only a very few employees had such complaints on their records indicates that the employers did not file such complaints frivolously. Although it may be said that the standards were strict at the time of promotion, it cannot be said that it was irrational or illogical to believe that those who had been subject to such employer complaints were not desirable material to add to the permanent work force.

Although deregistration for violation of the standards may appear harsh, this court does not function to substitute its judgment

---

18. The appellees were not restricted to adopting only physical standards. The work force appellees sought to obtain also required individuals of good character. *See Pacific Maritime Ass'n (Johnson Lee),* 155 N.L.R.B. 1231 (1965).

for that of the parties in selecting the yardstick with which to measure a longshoreman's qualifications for admission to fully registered status. The fact that over 80 per cent of the Class B men met the standards demonstrates that the overwhelming majority of them were aware of their obligations under the contract and that the union was remarkably successful in obtaining permanent status for most of the Class B men. The reliability criteria adopted by the appellees to deregister the B men cannot, as a matter of law, be held outside their powers under the contract. The results were harsh but so were the necessities that gave rise to the need for the decision.[19]

## IV

### Breach of the Collective Bargaining Agreement

Appellants assert finally that under the collective bargaining agreement the Port Committee could not adopt the 1963 standards without unanimous consent of the Coast Committee and without reducing the standards to writing. Thus, they argue, enforcement of the 1963 standards constituted a breach of the collective bargaining agreement.

Section 17.851 of the Pacific Coast Longshore agreement provides:

> More stringent rules and penalties than those provided hereinabove that are applicable to limited registered longshoremen or to nonregistered longshoremen or to both such groups *may be adopted or modified by unanimous action of the Joint Coast Labor Relations Committee and, subject to the control of such Committee so exercised, more stringent rules and penalties* applicable to limited registered men or nonregistered men or to both groups *that are provided in existing and future local joint working, dispatching, and registration rules and procedures* or by mutually agreed practices *shall be applicable.*

(Emphasis added). The 1958 Rules as well as the 1963 standards for deregistration were validly adopted by the Port Committee in accordance with the second clause in the subsection. Under that clause the Port Committee was entitled to promulgate future registration rules and procedures subject to the action of the Coast Committee setting them aside in exercise of its ultimate power over this subject.

■ Appellants point out that under section 22 of the Pacific Coast Longshore Agreement, "No provision or term of this Agreement may be amended, modified, changed, altered or waived except by a written document executed by the parties hereto." They claim that because the 1963 rules for deregistration were not in writing, enforcement breached section 22. As collateral operating procedures whose adoption is expressly authorized by section 17.851 of the collective bargaining agreement, these rules merely elaborate the basic terms of the agreement. Accordingly, they were not subject to the requirements of section 22.

Because the 1963 Rules were adopted pursuant to the explicit procedures provided in the PCLA, enforcement of them to deregister appellants did not breach the collective bargaining agreement.

### CONCLUSION

We believe that the district court erred in concluding that appellants failed to exhaust required grievance procedures. We nevertheless affirm on the merits because appellants have not demonstrated that PMA or the ILWU or its constituent Local breached either a duty of fair representation owed to appellants or the terms of the Pacific Coast Longshore Agreement.

AFFIRMED.

---

**19.** Because we hold that the union did not breach its duty of fair representation towards appellants, we need not decide whether the PMA colluded with the ILWU to deprive the discharged employees of fair representation. Cf. *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976); *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) (employer jointly liable with union for actions taken in grievance procedure that effect a "cover-up" for employer's contract violations).