James HENDRICKS, et al.,
Plaintiffs-Appellants,

v.

AIRLINE PILOTS ASSOCIATION, IN-
TERNATIONAL and United Airlines,
Inc., Defendants-Appellees.

No. 80–4042.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 11, 1982.

Decided Jan. 10, 1983.

William E. West, Jr., Burton & West, San
Francisco, Cal., for plaintiffs-appellants.

Robert H. Brown, Chicago, Ill., Robert S.
Savelson, New York City, argued, for de-

fendants-appellees; Jeffrey R. Walsh, Henning, Walsh & Ritchie, San Francisco, Cal., Cohen, Weiss & Simon, New York City, John B. Marchant, Sedgwick, Detert, Moran & Arnold, San Francisco, Cal., on brief.

Before BROWNING, Chief Judge, ANDERSON and SKOPIL, Circuit Judges.

BROWNING, Chief Judge:

Five United Airline pilots brought this action against their employer for breach of "contracts" by which the pilots agreed to work during their vacation periods in return for additional compensation; and against the Airline Pilots Association, their union, for breach of the duty of fair representation in negotiating a collective bargaining agreement that freed United of any obligation to perform these "contracts." The district court granted summary judgment for United and the union. We affirm.

I

The union has represented United's pilots in collective bargaining with the employer for over 40 years. In the spring of 1979 a strike curtailed hiring of new pilots, threatening to affect adversely both United and the union: United, because a shortage of pilots would preclude a projected expansion of its flight schedule and undercut its competitive position; the union, because failure to hire as many new pilots as planned would slow the anticipated rate of promotion and thus of salary increases.

In June 1979, the parties entered into a supplemental collective bargaining agreement to address the problem. The supplemental agreement noted United's inability to meet its flying schedules and that it was in the mutual interest of the parties that the scheduled hours be flown. The parties agreed United would be permitted to offer, and the pilots to accept, additional compensation in lieu of up to half the paid vacation the carrier was obliged to allow a pilot during the 1979–1980 vacation year under the collective bargaining agreement. The agreement recited that the company would accomplish this provision by "offering ... to 'buy back' from a pilot(s) all or part of his remaining 1979–80 vacation and the pilot(s) may agree to 'sell' that portion, or all, of his remaining vacation...." Pilots accepting the offer were to advise United within five days of notification. The additional compensation "resulting from this application" was to be paid to the pilots in two equal installments in August and December 1979.

United sent notices to its pilots stating it was prepared to buy back some of the vacation time pilots would otherwise take after August 31, and asking pilots to make a firm commitment as to the number of days of vacation they wished to relinquish in return for compensation. A substantial number of pilots, including the named plaintiffs, notified United they desired to accept the offer. In August 1979, United paid these pilots the first installment of the additional compensation promised in lieu of the vacation they had agreed to forgo. In September, United urged the pilots to increase their commitment to give up vacation time.

Within a month, however, the situation had changed. Because of a downturn in the economy and an increase in fuel prices, United found it necessary to reduce the number of scheduled flights. On September 13, 1979, United and the union entered into a second supplemental agreement. It was agreed that United would permit pilots to rescind their commitment to forgo vacation time and the advance payment the pilots had received in August would be deducted from their October and November earnings.

Economic conditions continued to worsen. In mid-October, United informed the union it would be necessary to discharge 100 to 150 pilots. The union initiated negotiations to avoid the discharges. On October 31, 1979, United and the union entered into a third supplemental agreement to deal with the new problem. By the terms of this agreement, pilots were to take one-half the

vacation time they had agreed to forfeit, the December installment of the vacation payment was not to be paid, and no pilots were to be discharged unless planned flying hours fell below a stated minimum.

This suit was filed November 15, 1979 by pilots dissatisfied because of the loss of the expectation of receiving additional compensation by forgoing vacation in accordance with their individual understandings with United.

Appellants make two claims. First, they contend that by negotiating the first supplemental agreement the union delegated to the individual pilots the authority to deal with United on this subject, and that the buy-back agreements between the pilots and United are therefore binding contracts. Second, they claim the union breached the statutory duty of fair representation in negotiating a collective bargaining agreement that released United from performance of these "contracts." They argue that summary judgment should have been granted for them and not for the union and United or alternatively, that summary judgment was inappropriate both because relevant facts were in conflict and because appellants should have been permitted additional discovery.

## II.

We consider first appellants' breach of contract claim. Appellants recognize that under the decisions in *J.I. Case Co. v. NLRB*, 321 U.S. 332, 337–39, 64 S.Ct. 576, 580, 88 L.Ed. 762 (1944), and *NLRB v. Allis-Chalmers Manufacturing Co.*, 388 U.S. 175, 180, 87 S.Ct. 2001, 2006, 18 L.Ed.2d 1123 (1967), a collective bargaining agreement with respect to terms and conditions of employment prevails over individual contracts between employers and employees concerning these subjects. They argue, however, that the collective bargaining agreement itself may authorize such private contracts, and that in this case the June collective bargaining agreement "effectively relinquished and delegated [to individual pilots] authority to deal with the narrow well defined item of 1979–1980 vacation

buyback." Alternatively, appellants argue that the June supplemental agreement should be construed as barring cancellation of individual pilot buy-back agreements without the affected pilot's consent.

Appellants argue that an intention to irrevocably commit the buy back of vacation to resolution by agreement between individual pilots and United is evidenced by the fact that the June agreement was negotiated to permit each pilot to enter into a separate agreement with United on this subject; that United's offer and individual pilot acceptances were made and executed on written forms; that consideration passed from the pilots to United in the form of a firm commitment to "sell" a specified number of their vacation days; and that, in exchange, consideration passed from United to each pilot in the form of United's agreement to "buy" a specified number of vacation days and to pay each pilot a fixed amount of compensation in two equal installments in August and December. Appellants point out that a sufficient number of pilots did not respond initially, indicating the program would have failed if the pilots had known the agreements were subject to cancellation. They suggest that because the pilots relied upon United's promise to pay, it should take "very strong, persuasive evidence" to infer the individual agreements could be cancelled without the pilots' consent, and that if United desired such protection, it should have included a cancellation clause in the June collective bargaining agreement.

We agree with appellants that "it is possible for the collective bargain ... expressly to leave certain areas open to individual bargaining." *J.I. Case Co. v. NLRB*, 321 U.S. at 338, 64 S.Ct. at 580. *See Order of Railroad Telegraphers v. Railway Express Agency, Inc.*, 321 U.S. 342, 347, 64 S.Ct. 582, 585, 88 L.Ed. 788 (1944); Cox & Dunlop, *Regulation of Collective Bargaining by the National Labor Relations Board*, 63 Harv.L. Rev. 389, 409–10 & n. 71 (1950). But it is also true that "[t]he practice and philosophy of collective bargaining looks with suspicion on such individual advantages." *J.I. Case*

*Co. v. NLRB,* 321 U.S. at 338, 64 S.Ct. at 580.

■ Section 301 of the Labor Management Relations Act authorized the federal courts to develop a federal common law regarding enforcement of collective bargaining agreements. *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). The federal courts were not left at large to devise any rules they might consider desirable. Rather, the federal common law must be "fashion[ed] from the policy of our national labor laws." *Id.* at 456, 77 S.Ct. at 917. Where, as here, no express statutory provision is applicable, the problem "will be solved by looking at the policy of the legislation and fashioning a remedy that will effectuate that policy." *Id.* at 457, 77 S.Ct. at 918. Congress sought to encourage the making of collective agreements and to promote industrial peace. Injecting private contract law into this process is not likely to further either policy objective.

■ Appellants concede the vacation buy-back proposal was a mandatory subject of collective bargaining. They also concede that rights created by collective bargaining ordinarily can be extinguished by subsequent collective bargaining. Appellants' contrary interpretation of the June collective bargaining agreement rests on the assumption that the union and United intended to relinquish control over important aspects of the employment relationship for a substantial period of time. An intention to agree to such an unusual abdication of collective bargaining responsibility should be attributed to the parties only on the strongest evidence. *See Lewis v. Benedict Coal Corp.,* 361 U.S. 459, 470–71, 80 S.Ct. 489, 495, 4 L.Ed.2d 442 (1960).

The language of the June collective bargaining agreement and the surrounding circumstances do not suggest irrevocable commitment of the subject of vacation buy-back to individual agreements. Words connoting purchase and sale were employed in the text of the agreement, but were enclosed in quotation marks to give notice the literal meaning was not intended. The form employed to obtain the election of individual pilots to relinquish vacation days did no more than offer each pilot the terms already fixed by the collective bargaining agreement. A pilot could elect to relinquish vacation time on those terms or not at all; *it was not open to him to negotiate different terms.* Pilots were routinely called upon to commit themselves in a similar way to administrative choices with respect to flying schedules, equipment options, and elections of domicile within parameters fixed by the collective bargaining agreement that were clearly subject to revision.

■ Appellants' reliance upon the use of contract terminology and implications drawn from general contract principles is misplaced. An agreement resulting from collective bargaining "is essentially an instrument of government, not merely an instrument of exchange." Cox, *Reflections upon Labor Arbitration,* 72 Harv.L.Rev. 1482, 1492 (1959). *See* Feller, *A General Theory of the Collective Bargaining Agreement,* 61 Calif.L.Rev. 663, 791 (1973). It is "more than a contract; it is an attempt at self-government. In dealing with such agreements courts should not be preoccupied with principles which might apply to an ordinary contract." *Lodge 1327, Int'l Ass'n of Machinists v. Fraser & Johnston Co.,* 454 F.2d 88, 92 (9th Cir.1971). *See Lewis v. Benedict Coal Corp.,* 361 U.S. at 468–70, 80 S.Ct. at 494–96; *United Steelworkers v. American Manufacturing Co.,* 363 U.S. 564, 567, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960); *Gunther v. San Diego & Arizona Eastern Railway Co.,* 382 U.S. 257, 261, 86 S.Ct. 368, 370, 15 L.Ed.2d 308 (1965); Feller, 61 Cal.L.Rev. at 705.

Appellants argue that *Lewis v. Benedict Coal Corp.* supports their interpretation of the June agreement. In *Lewis,* the collective bargaining agreement included an express provision that the welfare fund was "an irrevocable trust." 361 U.S. at 464–65. Moreover, the national labor policy argued in favor of the interpretation of the collective bargaining agreement adopted in that case, 361 U.S. at 470, 80 S.Ct. at 495, but argues against the interpretation urged by appellants in this case.

We conclude the June agreement did not irrevocably commit the subject of vacation buy-back to disposition by private contract, and that the October agreement dealing with this subject was therefore valid. Since appellants' action against the company for breach of contract rests upon the premise that the October collective bargaining agreement was invalid, appellants' contract claim is rejected.

### III

Appellants argue in the alternative that even if no individual contracts were formed, the union nonetheless breached its duty of fair representation because the October 31 amendment was arbitrary and discriminatory. Appellants argue the alleged discrimination arises "because [the union] confiscated the plaintiffs' right to compensation in favor [of] and directly [to] the economic benefit of the group of pilots subject to a potential lay off; and, second, to the economic benefit of all the other pilots in the bargaining unit who contributed nothing to the cost or consideration exchanged for United's no-furlough commitment, which, as the Court suggested, furthered the interests of the bargaining unit as a whole."

Under the collective bargaining system, selection of a union as the bargaining representative substantially reduces the ability of individual employees to deal directly with their employer. Hence, national labor policy "extinguishes the individual employee's power to order his own relations with his employer and creates a power vested in the chosen representative to act in the interests of all employees. 'Congress has seen fit to clothe the bargaining representative with powers comparable to those possessed by a legislative body both to create and restrict the rights of those whom it represents ....'" *Allis-Chalmers*, 388 U.S. at 180, 87 S.Ct. at 2006; *quoting Steele v. Louisville & Nashville Railroad Co.*, 323 U.S. 192, 202, 65 S.Ct. 226, 232, 89 L.Ed. 173 (1944).

Moreover, "because of the majoritarian bias inherent in collective bargaining—its commitment to democratic and egalitarian values—there must be some sacrifice of in-dividual freedom. Without that sacrifice there cannot be effective representation of the mass of employees, and without such representation, the future for any democratic society may be bleak." H. Wellington, *Labor and the Legal Process* 129 (1968). Negotiations require frank give and take between the union and the employer in which both parties should enjoy discretion to reach compromises freely. The Supreme Court took notice of the need for union discretion in bargaining in *Ford Motor Co. v. Huffman*, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953). "Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid.... A wide range of reasonableness must be allowed ...." *Id.* at 338, 73 S.Ct. at 686. *See Hardcastle v. Western Greyhound Lines*, 303 F.2d 182 (9th Cir.1962). "[T]he law of fair representation clearly permits a union to negotiate for and agree to contract provisions involving disparate treatment of distinct classes of workers ... as long as such conduct is not arbitrary or taken in bad faith." *Williams v. Pacific Maritime Ass'n*, 617 F.2d 1321, 1330 (9th Cir.1981).

The collective bargaining relationship, moreover, is a continuing relationship. "The assumption as well as the aim of [the Railway Labor Act] is a process of permanent conference and negotiation between the carriers on the one hand and the employees through their unions on the other." *Elgin, Joliet & Eastern Railway Co. v. Burley*, 325 U.S. 711, 753, 65 S.Ct. 1282, 1303, 89 L.Ed. 1886 (1945) (Frankfurter, J., dissenting), *quoted in International Ass'n of Machinists v. Street*, 367 U.S. 740, 760, 81 S.Ct. 1784, 1795, 6 L.Ed.2d 1141 (1961). "A collective bargaining contract operates prospectively over a substantial period of time and the parties cannot be expected to foresee all the problems that will develop in an industrial establishment within the period of the contract ...." *Watson v. International Brotherhood of Teamsters*, 399 F.2d 875, 879 (5th Cir.1968), *quoted in Turner v. Local Union No. 302, International Brotherhood of Teamsters*, 604 F.2d 1219, 1226 (9th

Cir.1979). "[C]ollective bargaining agreements must be flexible and subject to change.... It is frequently necessary to modify a contract to meet changing conditions." *Id.* These principles of national labor policy argue strongly against appellants' allegation the union breached its duty of fair representation in negotiating the October revision of the June agreement.[1] The hours the pilots worked, the compensation they received, the availability of pilot services sufficient to operate projected schedules, were matters of central interest to both the union and United. Economic and competitive changes requiring adjustments in the provisions of the collective bargaining agreement on these subjects were likely to occur yet difficult to anticipate.

Some pilots were deprived of an opportunity to obtain as much additional compensation as they had anticipated, but the jobs of other pilots were saved. The injury to the former was relatively slight, for although they received only half the additional pay they had expected, they gave up only half the vacation time they had offered to relinquish.

Appellants do not challenge the June agreement, yet it afforded appellants an opportunity to obtain compensation not paid other pilots. Both the creation of the preference and its termination were justified by the same basic consideration—the best interest of the bargaining unit as a group. Both agreements were rational accommodations to changing economic circumstances. Neither was vulnerable merely because its immediate impact was less favorable to some part of the group than another.

■ Aside from the merits, appellants argue that summary judgment was prema-

ture because disputed issues of material fact existed, and because further discovery should have been allowed. Appellants do not dispute the facts recited in this opinion as to the provisions of the supplementary collective bargaining agreements, the economic circumstances that lead to their negotiation, and the way in which the agreements were implemented. Application of the law to these undisputed facts requires the conclusion that the June agreement was subject to modification by subsequently negotiated agreements, and that the October agreement was binding upon the appellants and other members of the union because it was neither arbitrary, irrational, nor negotiated in bad faith. None of the discovery appellants have suggested would have altered the undisputed facts upon which this conclusion rests.

Affirmed.

---

1. This case is not analogous to an action by retirees challenging unilateral changes in their benefits. "If the union does undertake to represent retirees, its duty of fair representation requires that their vested retirement rights not be disturbed." *Toensing v. Brown,* 528 F.2d 69, 72 (9th Cir.1975). But retirees are not "employees" and hence are not members of the bargaining unit, and their benefits are not a mandatory subject of bargaining. *Allied Chemical & Alkali Workers, Local Union No. 1 v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 173, 182, 92 S.Ct. 383, 394, 399, 30 L.Ed.2d 341 (1971). If retirees were represented by the union, "the union would be bound to balance the interests of all its constituents, with the result that the interests of active employers might at times be preferred to those of retirees." *Id.* at 173 n. 12, 92 S.Ct. at 394 n. 12.