**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DON ADDINGTON, individual
resident of the State of Arizona
formerly employed by America
West Airlines, Inc. and presently
employed by its successor after
merger, US Airways, Inc.; JOHN
BOSTIC, individual resident of the
State of Arizona formerly
employed by America West
Airlines, Inc. and presently
employed by its successor after
merger, US Airways, Inc.; MARK
BURMAN, individual resident of the
State of Arizona, formerly
employed by America West
Airlines, Inc. and presently
employed by its successor after
merger, US Airways, Inc.; AFSHIN
IRANPOUR, individual resident of
the State of Arizona, formerly
employed by America West
Airlines, Inc. and presently
employed by its successor after
merger, US Airways, Inc.; ROGER
VELEZ, individual resident of the
State of Arizona, formerly
employed by America West
Airlines, Inc. and presently
employed by its successor after
merger, US Airways, Inc.;

STEVE WARGOCKI, individual
resident of the State of Arizona,
formerly employed by America
West Airlines, Inc. and presently
employed by its successor after
merger, US Airways, Inc.,
                    *Plaintiffs-Appellees,*

                    v.

US AIRLINE PILOTS ASSOCIATION, an
unincorporated association
representing the pilots in the
employment of US Airways Inc., a
Delaware corporation,
                    *Defendant-Appellant,*

                    and

US AIRWAYS, INC., a Delaware
corporation; STEPHAN BRADFORD;
ROBERT DAVISON; DOUGLAS L.
MOWERY,
                    *Defendants.*

No. 09-16564

DC No.
CV 08-1633 NVW

OPINION

Appeal from the United States District Court
for the District of Arizona
Neil V. Wake, District Judge, Presiding

Argued and Submitted
December 8, 2009—San Francisco, California

Filed June 4, 2010

Before: A. Wallace Tashima, Susan P. Graber, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Tashima;
Dissent by Judge Bybee

**COUNSEL**

Andrew S. Jacob, Polsinelli Shughart, PC, Phoenix, Arizona, for the plaintiffs-appellees.

Lee Seham, Seham, Seham, Meltz & Petersen, LLP, White Plains, New York, for the defendant-appellant.

**OPINION**

TASHIMA, Circuit Judge:

This case arose out of a bitter seniority dispute precipitated by the merger of US Airways, Inc., and America West Airlines ("AWA"). Following the merger, the companies' respective seniority lists had to be integrated to create a single list for the merged airline. The US Airways, Inc., pilots ("East Pilots") and the AWA pilots ("West Pilots"), who were both represented by the Air Line Pilots Association ("ALPA"), began exploring methods of integration pursuant to ALPA's policy regarding mergers. The East Pilots generally had been hired earlier and favored a strict date-of-hire system, while the West Pilots sought a seniority system that would take into consideration the relative pre-merger strength of their airline over US Airways, Inc. Ultimately, the union submitted the internal dispute to arbitration.

Although it is common for a merger to raise the issue of integrating seniority lists, this case contains an added wrinkle. The East Pilots, who were dissatisfied with the seniority integration proposal ALPA arrived at through the union's internal arbitration, led a successful effort to decertify ALPA and replace it with a new union, US Airline Pilots Association ("USAPA"). Headed by an East Pilot, USAPA was constitutionally committed to pursuing date-of-hire principles, in contrast to ALPA, whose merger policy committed it to pursuing the arbitrated seniority list.

Certain West Pilots brought this action against the newly-certified union alleging that USAPA breached its duty of fair representation ("DFR") by negotiating a contract that would impermissibly favor the East Pilots at the expense of the West Pilots. A jury found that the union had breached its DFR, and the district court, after a bench trial on the remaining equitable issues, granted the West Pilot Plaintiffs an injunction against USAPA. *Addington v. US Airline Pilots Ass'n*, 2009

WL 2169164 (D. Ariz. July 17, 2009). USAPA contends, *inter alia*, that the district court never had jurisdiction because the West Pilots' claim is not ripe. We agree.

## BACKGROUND

In 2005, US Airways, Inc., and AWA merged to form a single carrier called US Airways (or the "airline"). At the time of the merger, ALPA was the collective bargaining representative for both the East Pilots and the West Pilots. Each group had a separate collective bargaining agreement ("CBA") which was administered by each group's Master Executive Council. As with most mergers, an integrated seniority list had to be created. The East Pilots were the bigger group — about 5,100, compared to about 1,900 West Pilots — and were generally hired before the West Pilots. The West Pilots received more favorable wages under their CBA and, unlike the East Pilots, no West Pilots were furloughed at the time of the merger.

The two merging airlines and ALPA entered into a Transition Agreement ("TA"), which incorporated by reference ALPA's Merger Policy. Under the TA, the carriers agreed not to object to ALPA's seniority integration proposal, provided it did not result in certain additional costs. The seniority integration proposal could be implemented only as part of a single CBA. The single CBA would require approval by the East Master Executive Council, the West Master Executive Council, and a majority of each of the East and West pilot groups, effectively giving each side a veto. Until the single CBA was negotiated, with few exceptions, the TA placed a "fence" between East and West operations, such that each would continue to operate under its respective CBA.

Pursuant to the ALPA Merger Policy, the two pilot groups began negotiating seniority integration, but to no avail. Under the union's Merger Policy, if negotiation and mediation between the two sides fail, the issue is submitted to "final and

binding" arbitration. The merged seniority list is then presented to the airline, and ALPA is to "use all reasonable means at its disposal to compel the company to accept and implement the merged seniority list." The arbitrated list is not subject to a separate ratification vote, but becomes part of the single CBA, which is subject to member ratification.

George Nicolau was selected to chair the arbitration panel, pursuant to the Merger Policy. Arbitration commenced between "the US Airways Pilot Merger Representatives and the America West Pilot Merger Representatives." In early May 2007, the panel issued its award (the "Nicolau Award"). A majority of East Pilots "strenuously objected" to the Nicolau Award and opposed its implementation. The East Pilot representatives sought to have ALPA prevent implementation of the Nicolau Award. ALPA unsuccessfully attempted to get the two sides to reach a compromise.

While the arbitration was pending, negotiations with the airline progressed, and the airline proposed a comprehensive CBA in May 2007. In late July 2007, the East Master Executive Council determined that the East Pilots would never ratify a CBA that incorporated the Nicolau Award. On August 15, 2007, the East Pilots withdrew their representatives from the committee negotiating the new CBA with the airline, halting those negotiations. In late 2007, ALPA submitted the Nicolau Award to the airline, which accepted the award on December 20, 2007.

In the meantime, several East Pilots began exploring the possibility of forming a new union that would not implement the Nicolau Award. They formed USAPA and, on November 29, 2007, the National Mediation Board certified a representation election. USAPA won the election and was certified as the collective bargaining representative for the entire group of pilots, East and West, on April 18, 2008. From the date the East Pilots withdrew from negotiations until ALPA was decertified, there were no further negotiations with the airline.

USAPA adopted a constitution that established an "objective" of "maintain[ing] uniform principles of seniority based on date of hire and the perpetuation thereof, with reasonable conditions and restrictions to preserve each pilot's un-merged career expectations." Under USAPA's constitution, ratification requires a majority vote of the entire union membership, such that each pilot group no longer has its own veto power.

Five months after certification, USAPA presented a seniority proposal to the airline. The proposal incorporated date-of-hire principles. Although the proposal contained some protections for West Pilots, it was not nearly as favorable to West Pilots as the Nicolau Award. The airline had not yet responded to the proposal when the district court entered its permanent injunction.

The airline has been forced to reduce flying because of economic considerations. The reductions have mostly hit the western operations. Because of the continuing separate operations, approximately 175 of the 300 furloughs the airline had announced by the time of trial were West Pilots. At the time of trial, 140 West Pilots had been furloughed. Under a single CBA incorporating the Nicolau Award, none of the West Pilots would have been furloughed.

Six individual West Pilot-Plaintiffs ("Plaintiffs") filed this hybrid action against USAPA and US Airways, seeking damages and injunctive relief. The district court dismissed the claims against the airline because the System Board of Adjustment had exclusive jurisdiction over them. *Addington v. US Airlines Pilots Ass'n*, 588 F. Supp. 2d 1051, 1064 (D. Ariz. 2008). Plaintiffs amended their complaint in the surviving DFR action, specifying that the claim was brought on behalf of similarly situated West Pilots. The district court certified a class of West Pilots and set a bifurcated trial schedule. After a jury trial on liability, the jury found that USAPA had violated the DFR because it abandoned the Nicolau Award in

favor of a date-of-hire list solely to benefit the East Pilots at the expense of the West Pilots.

After a bench trial on remedy, the district court ordered injunctive relief, permanently enjoining and ordering USAPA to (1) "Immediately, and in good faith, make all reasonable efforts to negotiate and implement a single [CBA] with US Airways that will implement the Nicolau Award seniority proposal . . ."; (2) "Make all reasonable efforts to support and defend the seniority rights provided by or arising from the Nicolau Award in negotiations with US Airways"; and (3) "Not negotiate for separate [CBAs] for the separate pilot groups . . . ." The district court denied USAPA's post-trial motions for judgment as a matter of law and for a new trial. USAPA timely appealed, and this court granted USAPA's unopposed motion to expedite this appeal.

## DISCUSSION

**[1]** Although considerable time, effort, and expense have been devoted to the merits of Plaintiffs' DFR claim before both this Court and the district court, we are without jurisdiction to address the merits of the claim unless it is ripe. *See S. Pac. Transp. Co. v. City of L.A.*, 922 F.2d 498, 502 (9th Cir. 1990). We review ripeness *de novo. See Manufactured Home Cmtys. Inc. v. City of San Jose*, 420 F.3d 1022, 1025 (9th Cir. 2005); *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1084 (9th Cir. 2003). If the claim before us is not ripe, we must dismiss. *See S. Pac. Transp.*, 922 F.2d at 502.

**[2]** No published case has expressly addressed when a DFR claim based on a union's negotiation of a CBA becomes ripe. Thus, we apply the general principles underlying the ripeness doctrine and take guidance from our decisions regarding the related issue of when a DFR claim accrues for statute of limitations purposes in the context of the administration of a CBA. We conclude that Plaintiffs' DFR claim is not yet ripe.

**[3]** The ripeness doctrine rests, in part, on the Article III requirement that federal courts decide only cases and controversies and in part on prudential concerns. *See Maldonado v. Morales*, 556 F.3d 1037, 1044 (9th Cir. 2009), *cert. denied*, 130 S. Ct. 1139 (2010); *W. Oil & Gas Ass'n v. Sonoma County*, 905 F.2d 1287, 1290 (9th Cir. 1990). The ripeness inquiry is "intended to 'prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.' " *Maldonado*, 556 F.3d at 1044 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)). To determine whether a case is ripe, "we consider two factors: 'the fitness of the issues for judicial decision,' and 'the hardship to the parties of withholding court consideration.' " *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1211-12 (9th Cir. 2006) (en banc) (per curiam) (quoting *Abbott Labs.*, 387 U.S. at 149). Both factors militate in favor of finding this claim premature.

**[4]** A question is fit for decision when it can be decided without considering "contingent future events that may or may not occur as anticipated, or indeed may not occur at all." *Cardenas v. Anzai*, 311 F.3d 929, 934 (9th Cir. 2002) (internal quotation marks omitted); *see also United States v. Streich*, 560 F.3d 926, 931 (9th Cir.), *cert. denied*, 130 S. Ct. 320 (2009). "At the same time, a litigant need not 'await the consummation of threatened injury to obtain preventive relief. If the injury is *certainly* impending, that is enough.' " *Id.* (quoting *18 Unnamed "John Smith" Prisoners v. Meese*, 871 F.2d 881, 883 (9th Cir. 1989) (emphasis in *Streich*)).

**[5]** We conclude that this case presents contingencies that could prevent effectuation of USAPA's proposal and the accompanying injury. At this point, neither the West Pilots nor USAPA can be certain what seniority proposal ultimately will be acceptable to both USAPA and the airline as part of a final CBA. Likewise, it is not certain whether that proposal will be ratified by the USAPA membership as part of a new,

single CBA. Not until the airline responds to the proposal, the parties complete negotiations, and the membership ratifies the CBA will the West Pilots actually be affected by USAPA's seniority proposal — whatever USAPA's final proposal ultimately is. Because these contingencies make the claim speculative, the issues are not yet fit for judicial decision.

**[6]** We also conclude that withholding judicial consideration does not work a direct and immediate hardship on the West Pilots. "To meet the hardship requirement, a litigant must show that withholding review would result in 'direct and immediate' hardship and would entail more than possible financial loss." *Winter v. Cal. Med. Review, Inc.*, 900 F.2d 1322, 1325 (9th Cir. 1990) (citing *Cal. Dep't of Educ. v. Bennett*, 833 F.2d 827, 833-34 (9th Cir. 1987)); *see also Am. Trucking Ass'ns v. ICC*, 747 F.2d 787, 790 (D.C. Cir. 1984) (finding no hardship where the policy statement the plaintiffs challenged "neither impose[d] any obligation upon [the plaintiffs], nor in any other respect ha[d] any impact upon them 'felt immediately . . . in conducting their day-to-day affairs' " (quoting *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 164 (1967))).

**[7]** Plaintiffs correctly note that certain West Pilots have been furloughed, whereas they would still be working under a single CBA implementing the Nicolau Award. It is, however, at best, speculative that a single CBA incorporating the Nicolau Award would be ratified if presented to the union's membership. ALPA had been unable to broker a compromise between the two pilot groups, and the East Pilots had expressed their intentions not to ratify a CBA containing the Nicolau Award. Thus, even under the district court's injunction mandating USAPA to pursue the Nicolau Award, it is uncertain that the West Pilots' preferred seniority system ever would be effectuated. That the court cannot fashion a remedy

that will alleviate Plaintiffs' harm suggests that the case is not ripe.[1]

[8] Plaintiffs seek to escape this conclusion by framing their harm as the lost opportunity to have a CBA implementing the Nicolau Award put to a ratification vote. Because merely putting a CBA effectuating the Nicolau Award to a ratification vote will not itself alleviate the West Pilots furloughs, Plaintiffs have not identified a sufficiently concrete injury.[2] Additionally, USAPA's final proposal may yet be one that does not work the disadvantages Plaintiffs fear, even if that proposal is not the Nicolau Award.[3]

---

[1]The dissent asserts that "nothing would be gained by postponing a decision, and the parties' interest would be well served by a prompt resolution of the West Pilots' claim." Diss. op. at 8017 (internal alterations, quotation marks, and citation omitted). To be sure, the parties' interest would be served by prompt resolution of *the seniority dispute*, but that is not the same as prompt resolution of the DFR claim. The present impasse, in fact, could well be prolonged by prematurely resolving the West Pilots' claim judicially at this point. Forced to bargain for the Nicolau Award, any contract USAPA could negotiate would undoubtedly be rejected by its membership. By deferring judicial intervention, we leave USAPA to bargain in good faith pursuant to its DFR, with the interests of all members — both East and West — in mind, under pain of an unquestionably ripe DFR suit, once a contract is ratified.

[2]Plaintiffs' alleged hardship cannot instead be premised on any delay caused by USAPA in reaching a single CBA. As the district court noted, Plaintiffs abandoned their claim that USAPA is intentionally delaying negotiation of a CBA. *Addington*, 2009 WL 2169164, at *22 ("During discovery, Plaintiffs retreated from any notion of deliberate delay on the part of USAPA."). The dissent's assertion that "the absence of a CBA is itself powerful evidence of a DFR violation," Diss. op. at 8015, is therefore misplaced. Although absence of a CBA might be evidence of a DFR violation, if the violation were based on deliberate delay by the union, it is not evidence of a union's improper preference of one seniority system over another. As demonstrated by ALPA's similar difficulties in reaching a CBA, the pilot groups, and individual pilots with their ratification/non-ratification powers, are the major contributors to the absence of a CBA in these circumstances.

[3]We do not address the thorny question of the extent to which the Nicolau Award is binding on USAPA. We note, as the district court recog-

**[9]** Although we do not hold that a DFR claim based on a union's promotion of a policy is never ripe until that policy is effectuated, we conclude that, in this case, there is too much uncertainty standing in the way of effectuation of Plaintiffs' harm to warrant judicial intervention at this stage. *Cf. Sergeant v. Inlandboatmen's Union of the Pac.*, 346 F.3d 1196, 1200 (9th Cir. 2003) (examining Labor Management Reporting and Disclosure Act issue "in light of the well-established federal policy of avoiding unnecessary interference in the internal affairs of unions and according considerable deference to the interpretation and application of a union's rules and regulations").[4]

Our conclusion that Plaintiffs' claim is not ripe is consistent with our DFR decisions, which have found DFR violations based on contract negotiation only after a contract has been agreed upon.[5] *See, e.g.*, *Williams v. Pac. Mar. Ass'n*, 617

---

nized, that USAPA is at least as free to abandon the Nicolau Award as was its predecessor, ALPA. The dissent appears implicitly to assume that the Nicolau Award, the product of the internal rules and processes of ALPA, is binding on USAPA. *See* Diss op. at 8021-22.

[4]The dissent agrees with "the general rule that we evaluate the duty of fair representation based on the fairness of the actual representation as memorialized in the [CBA,]" but would hold that this "is an unusual case and . . . an exception" to that rule. Diss. op. at 8015. As much as the dissent stresses the case-specific nature of our inquiry, however, there is no disputing that this case would be the first time we allowed a DFR suit to proceed in a collective bargaining/ contract negotiating context before the CBA at issue was ratified. Such a departure from the norm would invite parties to bring suit long before internal disputes have had a chance to work themselves out. It would also force us in each case to decide — without the benefit of hindsight that is enjoyed in statute of limitations accrual cases — whether a union's position is a mere announcement of a bargaining position or the adoption of a permanent change in position. Although the dissent believes that it is an easy question in this case, it will not always be so.

[5]Plaintiffs have identified only one case in which a court allowed a DFR suit to proceed before a contract had been executed. *See Mount v. Grand Int'l Bhd. of Locomotive Eng'rs*, 226 F.2d 604, 608 (6th Cir. 1955). In

F.2d 1321, 1328, 1330 (9th Cir. 1980) (involving suit for breach of DFR in negotiating CBA brought after rules at issue were adopted); *Bernard v. Air Line Pilots Ass'n*, 873 F.2d 213, 215 (9th Cir. 1989) (involving suit for breach of DFR during negotiations brought after agreement between union and employer was reached); *Hendricks v. Airline Pilots Ass'n*, 696 F.2d 673, 674-75 (9th Cir. 1983) (same).

Indeed, the Supreme Court case that clarified that the DFR was applicable during contract negotiations articulated its holding in terms that imply a claim can be brought only after negotiations are complete and a "final product" has been reached. *See Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 78 (1991) ("[T]he final product of the bargaining process may constitute evidence of a breach of duty only if it can be fairly characterized as so far outside a 'wide range of reasonableness,' that it is wholly 'irrational' or 'arbitrary.' " (quoting *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953))).

Notably, even in the cases on which Plaintiffs rely most

*Mount*, the union notified employees that it would negotiate a contract amendment in direct opposition to a series of rulings that had been made pursuant to the union's internal policies. *Id.* at 605-06. The Sixth Circuit held that the fact that the proposed contract had not been executed did not make the plaintiff's DFR action premature. *Id.* at 608. *Mount*, however, contained only a cursory analysis of the ripeness issue, and we are not persuaded to apply its conclusion to this case. More recent cases have held that a claim does not accrue when the union merely announces its intention to breach its DFR in the future. *See Ramey v. Dist. 141, Int'l Ass'n of Machinists & Aerospace Workers*, 378 F.3d 269, 279 (2d Cir. 2004) ("[W]e do not require, or even permit, union members to bring a suit against their union simply because the union has announced its future intention to break its duty."); *Teamsters Local Union No. 42 v. NLRB*, 825 F.2d 608, 615-16 (1st Cir. 1987) ("Knowledge of a party's predisposition to commit an unfair labor practice or suspicion that, when the moment is opportune, the knife thrust will follow, is not enough to galvanize § 10(b). The statute begins to run only when the impermissible act or omission — the unfair labor practice — actually takes place.").

heavily, the policy that the plaintiffs claimed injured them had already been effectuated when the plaintiffs brought the claim. *See Ramey v. Dist. 141, Int'l Ass'n of Machinists & Aerospace Workers*, 378 F.3d 269, 275-76 (2d Cir. 2004) (noting that airline had *accepted* union's seniority system and the plaintiffs had been furloughed as a result); *Teamsters Local Union No. 42 v. NLRB,* 825 F.2d 608, 611 (1st Cir. 1987) (noting that shifts had been *assigned* according to union's seniority system). Although both the *Ramey* court and *Teamsters* court concluded the claim accrued (for statute of limitations purposes) before effectuation of the policy at issue, *see Ramey*, 378 F.3d at 279-80 (holding that claim accrued when union advocated seniority position to employer during contract negotiations); *Teamsters*, 825 F.2d at 614-15 (holding that claim accrued when union announced to the plaintiffs that they had been assigned to less desirable shift, even though negotiations with employer regarding the seniority system that would dictate shift assignments occurred two months later), the holdings are not as easily applied in our situation as plaintiffs urge.[6] In both *Ramey* and *Teamsters*, the

---

[6]Indeed, we are hesitant to transplant a rule from cases analyzing claim accrual for statute of limitations purposes to the ripeness context. Although we have noted the relationship between the statute of limitations and ripeness inquiries, *see Levald, Inc. v. City of Palm Desert*, 998 F.2d 680, 687 (9th Cir. 1993) ("Determining when the cause of action accrues is merely the corollary to the ripeness inquiry."), there are key differences in the posture of a case that presents a statute of limitations issue and one that presents a ripeness issue. In a statute of limitations case, unlike a ripeness case, the injury has unquestionably culminated, and the issue is whether the plaintiffs learned or should have learned of the injury so long ago that it would no longer be fair to bring the suit. In deciding these cases, courts often decline to identify a specific date on which the claim accrued, instead identifying the "earliest" or "latest" date it could have accrued, depending on whether the court determines the claim to have fallen inside or outside the applicable statute of limitations. *See, e.g.*, *Gvozdenovic v. United Air Lines, Inc.*, 933 F.2d 1100, 1106 (2d Cir. 1991) (concluding that claim was time-barred because it accrued "at the latest" on the date the union ratified the allegedly violative agreement, which was more than six months before filing).

unions argued that the plaintiffs' claims had accrued more than six months prior to filing, such that the cases were barred by the statute of limitations. *Ramey*, 378 F.3d at 276; *Teamsters*, 825 F.2d at 614. In addressing whether the cases were time-barred, each court was faced with the issue whether the claim accrued when the union announced its *intention* to take a negotiating position that would amount to a DFR breach (a date that fell outside the six-month period) or when the union actually advocated that position to the employer during negotiations (a date that fell within the six-month period). *Ramey*, 378 F.3d at 278-80; *Teamsters*, 825 F.2d at 614-15. The court in each case found that the claim accrued at the later date. *Ramey*, 378 F.3d at 279-80; *Teamsters*, 825 F.2d at 614-15. Significantly, however, because the date the union advocated its position in negotiations fell within the six-month period in both cases, there would have been no need for the plaintiffs to argue that the claim did not accrue until effectuation of the policy. Moreover, because the seniority systems at issue already had been effectuated in both cases, the courts simply were not faced with the possibility of interfering in a union's internal conflict before the conflict manifested as concrete injury to the plaintiffs.

We also note in these cases the apparent absence of contingencies that stood between the union's advocating to the employer a position on a certain policy and the implementation of that policy. Neither *Ramey* nor *Teamsters* references a ratification requirement, and in both cases the employer seemed predisposed to follow the union's proposal. In *Teamsters*, the court found accrual at the date the union communicated its adverse action to the employees. 825 F.2d at 614-15. Although the negotiations that would result in that adverse action had not yet been completed, the announcement was definitive. *Id.* In *Ramey*, the underlying district court decision indicates that the employer had already agreed to accept whatever seniority system the union proposed. *See Ramey v. Dist. 141, Int'l Ass'n of Machinists & Aerospace Workers*, 2002 WL 32152292, at *4 (E.D.N.Y. Nov. 4, 2002) (noting that the

transition agreement in effect gave the union "complete control over the issue of seniority"). Because of these distinctions, we are not convinced that these cases, even if they were binding on us, would require a finding of ripeness in the circumstances of the case at bench.[7]

Finally, we find instructive our cases analyzing accrual of DFR claims that are based on a union's alleged errors outside the contract negotiation process.[8] In the grievance context, too, we have required that a final outcome be reached before allowing a suit based on a union's allegedly violative conduct that led to the decision. *See Kozy v. Wings W. Airlines, Inc.*, 89 F.3d 635 (9th Cir. 1996). In *Kozy*, an employee brought a DFR claim alleging the union committed errors while repre-

---

[7]Plaintiffs correctly note that *Ramey* suggests a DFR claim can accrue before implementation of the policy at issue. Analogizing to anticipatory repudiation in a breach of contract case, the *Ramey* court noted that it would be possible — but not required — for a claim to be brought when a union unequivocally communicates its intention to breach its DFR, but that for statute of limitations purposes, the claim did not accrue until "the date on which performance was due, namely the date on which [the union] advocated a position on the seniority issue to [the employer]." 378 F.3d at 279-80. The court went on, however, to qualify its holding, recognizing the requirement of likelihood of harm:

Because we hold that [the union] has not met its burden to demonstrate that plaintiffs reasonably should have known that the breach occurred before January 28, 1999 [the date six months before filing date], we do not address the difficult and unsettled question of how certain it must be that harm will be caused by a union's breach in order to trigger the statute of limitations. We have held that the statute of limitations is triggered even if it is not absolutely certain that a union member will be harmed by a breach. However, we note that there must be *some* likelihood that a harm will result from a union's breach before a member may file suit. Otherwise, such claims would be unduly speculative. We caution district courts to consider this issue in the future when faced with a suit brought after a union breaches but before tangible harm is caused.

*Id.* at 280 n.5 (citations omitted).

[8]The DFR applies both to contract negotiation and contract administration. *See O'Neill*, 499 U.S. at 67.

senting him in a grievance hearing before an arbitrator. *Id.* at 638. We held that the claim had not accrued until the arbitrator's written decision was issued. *Id.* at 639. We noted that

> There was, at one time, some indication in this Circuit that the employee 'should know' of his Union's errors in representing him at a hearing when he saw the errors committed during the hearing, and that the six-month [statute of limitations] period began to run from that date even if the grievance board had not yet rendered its final decision."

*Id.* at 640 (citing *Galindo v. Stoody Co.*, 793 F.2d 1502, 1509 (9th Cir. 1986)). However, we stated, *Galindo* resolved that confusion, holding that a claim accrues for statute of limitations purposes only when the employee learns of the arbitrator's award. *Kozy*, 89 F.3d at 640 (citing *Galindo*, 793 F.2d at 1509). The holding in *Galindo* "recognize[d] that the arbitrator's final decision could make the employee whole despite the union's errors, and that the arbitrator could change his mind at any time prior to issuing a final and binding decision." *Kozy*, 89 F.3d at 640 (citing *Galindo*, 793 F.2d at 1509). Similarly, in the context of negotiations toward a CBA, the parties could shift positions until negotiations are complete, and the final agreement could be acceptable to Plaintiffs.

## CONCLUSION

**[10]** For the foregoing reasons, we hold that Plaintiffs' DFR claim is not ripe; therefore, the case is **REMANDED** to the district court with directions that the action be **DISMISSED**. No costs to either side.

BYBEE, Circuit Judge, dissenting:

I agree with much of the majority opinion. I concur that, in general, we should not decide duty of fair representation ("DFR") challenges until "after a contract has been agreed upon." Maj. Op. at 8009. In the typical case, the contract will be the best evidence of fair representation or lack thereof. In my view, however, the contract is not the *sine qua non* of unfair representation, and the fact that a case could be more ripe—in the sense that the issues could be more concrete, more focused—is not evidence of the contrary proposition that the case is *not* ripe.

This is an unusual case and, in my view, an exception to the general rule that we evaluate the duty of fair representation based on the fairness of the actual representation as memorialized in the Collective Bargaining Agreement ("CBA"). Here, the absence of a CBA is itself powerful evidence of a DFR violation. As set forth quite fairly in the majority opinion and in a lengthy and careful opinion by the district court, the Air Line Pilots Association ("ALPA") was decertified and a new union, the U.S. Airline Pilots Association ("USAPA"), certified precisely to frustrate implementation of the Nicolau Agreement and to negotiate a CBA with U.S. Airways that favors the East Pilots. As the district court found, "USAPA's sole objective in adopting and presenting its seniority proposal to the Airline was to benefit East Pilots at the expense of West Pilots, rather than to benefit the bargaining union as a whole." Thus, "the terms of USAPA's seniority proposal are substantially less favorable to West Pilots than the Nicolau Award" made through binding arbitration, an award that "USAPA concedes that it will never bargain for." It has been nearly five years since the two airlines merged, and the pilots are further from, not closer to, a CBA that reflects the interests of both pilot groups. Although a CBA would supply tangible evidence of a violation of the DFR, in this case, there is sufficient evidence to consider the West Pilots' complaint without the CBA. The issues are concrete and were well

developed in district court proceedings that included a jury trial (for damages) and a bench trial (for equitable relief). I would hold the case is ripe for decision and decide the appeal on the merits.

I

The "basic rationale" of the ripeness doctrine "is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985). "Constitutional ripeness, in many cases, 'coincides squarely with standing's injury in fact prong' and 'can be characterized as standing on a timeline.' " *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1122 (9th Cir. 2009) (quoting *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000)). Ripeness is a case-specific inquiry and does not lend itself to broad, bright-line rules based on the type of claim asserted. In *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1212 (9th Cir. 2006) (en banc), we wrote that "[i]t is [ ] important to a ripeness analysis that we specify the precise legal question to be answered. Depending on the legal question, the case may be ripe or unripe. If we ask the wrong legal question, we risk getting the wrong answer to the ripeness question."

A

Getting the legal question right is critical. Two related cases from the Supreme Court are particularly instructive here. In *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984), the Court held that a plaintiff's challenges to the constitutionality of an arbitration and compensation scheme in the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") would not become ripe until the "[Environmental Protection Agency] ha[d] considered data submitted by [the plaintiff] in evaluating another application and an arbitrator ha[d] made an award . . . ." *Id.* at 1020. The very next term, however, in

*Thomas v. Union Carbide Agricultural Products Co.*, the Court held that a similar constitutional challenge to FIFRA's arbitration provisions was ripe even though *none* of the thirteen plaintiffs was actually challenging an arbitration award. 473 U.S. at 579-82. Only one plaintiff—Stauffer Chemical Company—had engaged in arbitration, and it sought to enforce the award. None of the twelve other plaintiffs had actually engaged in an arbitration under FIFRA, but they alleged that they were "aggrieved by the *threat* of an unconstitutional arbitration procedure." *Id.* at 579. The Court did not dismiss *any* plaintiff's claims on ripeness grounds: "One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough. *Nothing would be gained by postponing a decision*, and the public interest would be well served by a prompt resolution of the constitutionality of FIFRA's arbitration scheme." *Id.* at 581-82 (quotation marks and citations omitted) (emphasis added).

What our decision in *Yahoo!* and the Court's decisions in *Monsanto* and *Thomas* make clear is that ripeness is a contextual and commonsense doctrine. If the unique circumstances of a particular claim render it fit for decision, the claim is ripe. I submit that this is a case in which "[n]othing would be gained by postponing a decision, and the [parties'] interest[s] would be well served by a prompt resolution of" the West Pilots' DFR claim. *Id.* at 582.

B

"[A] union breaches the duty of fair representation when its conduct toward a member of the bargaining unit is arbitrary, discriminatory, or in bad faith." *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 44 (1998). "The duty . . . is the quid pro quo for the union's right to exclusive representation; it protects employees in the minority from arbitrary discrimination by the majority union." *Laborers & Hod Carriers, Local No. 341 v. N.L.R.B.*, 564 F.2d 834, 839-40 (9th Cir. 1977).

The majority describes three DFR cases from this circuit—*Williams v. Pacific Maritime Association*, 617 F.2d 1321 (9th Cir. 1980), *Bernard v. Airline Pilots Association*, 873 F.2d 213 (9th Cir. 1989), and *Hendricks v. Air Line Pilots Association*, 696 F.2d 673 (9th Cir. 1983)—as "f[inding] DFR violations based on contract negotiation only after a contract has been agreed upon," Maj. Op. at 8009. These cases are not only distinguishable, but completely inapposite. First, none of these cases even mentions ripeness. Together, *Williams*, *Bernard*, and *Hendricks* stand for the uncontroversial proposition that a DFR claim *can* be brought after a CBA or finalized seniority integration agreement has been completed. The issue here, however, is whether a DFR claim *must* be brought after a CBA or finalized seniority integration agreement, which none of our cases cited by the majority even purports to address.

Just as importantly, none of these cases addressed the "precise legal question" advanced by the West Pilots. In *Williams*, "[t]he heart of the employees' claim of unfair representation [wa]s that the union breached its statutory duty to plaintiffs *by agreeing to the adoption of* [certain] standards for deregistration." 617 F.2d at 1328 (emphasis added). In *Bernard*, the factual situation was basically a mirror image of this case: the merger of Alaska Air Group and Jet America became effective on October 1, 1987, and a seniority integration agreement was completed less than a week later, on October 6, 1987. 873 F.2d at 215. The plaintiffs in *Bernard* sued immediately thereafter and were quickly granted preliminary injunctive relief, which we upheld. *Id.* at 215, 219. Here, the West Pilots claim to be aggrieved by the *failure* to pursue the memorialization of an arbitration award in a finalized seniority integration agreement, while in *Bernard* the claim was the opposite: an agreement was memorialized almost immediately, without taking into account a preexisting merger policy. Finally, in *Hendricks*, plaintiffs argued that "the union [ ] breached its duty of fair representation because [*a contract*] *amendment* was arbitrary and discriminatory." 696 F.2d at 677 (emphasis

added). Like the theory in *Williams*, the plaintiffs' theory in *Hendricks* actually challenged a memorialized agreement and was therefore not the "precise" legal theory advanced here.

The majority also cites *Air Line Pilots Association v. O'Neill*, 499 U.S. 65 (1991) ("*ALPA*"), for the proposition that "a claim can only be brought once negotiations are complete and a 'final product' has been reached." Maj. Op. at 8010. With all due respect, this overstates what *ALPA* said. *ALPA* said nothing about the ripeness doctrine. What the Court said was that "[a]ny substantive examination of a union's performance . . . must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities. For that reason, the final product of the bargaining process may constitute evidence of a breach of duty . . . ." 499 U.S. at 78 (internal citations omitted). The Court's statement in *ALPA* only confirms what we already know: a CBA may be the best evidence of satisfaction of or violation of the DFR. But the Court's equivocal "*may* constitute evidence" falls well short of confirming that "a claim can *only* be brought" once there is a CBA.

None of these cases are relevant with respect to the ripeness issue here. They stand for the noncontroversial proposition that a DFR claim can be brought after a CBA has been completed. By contrast, the issue here is whether a DFR claim can be brought *prior* to the completion of a CBA.

II

I agree with the majority that this case would be ripe if USAPA and U.S. Air had entered into a CBA. That is not the question that this case presents. We are asked whether our Article III jurisdiction extends to a DFR claim based on a union "constitutionally committed," Maj. Op. at 8001, to voiding a binding arbitration award and adopting a "date of hire" seniority principle that plainly favors one side of a

merger. When the question is posed in this way, I believe the ripeness of the West Pilots' claims becomes clear.

We employ a two-part test to determine whether a claim is ripe for review, evaluating "(1) whether the issues are fit for judicial decision, and (2) whether the parties will suffer hardship if we decline to consider the issues." *San Diego County Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1132 (9th Cir. 2006). The issues raised by the West Pilots' DFR claim are straightforward, and the uncontested facts of this case make clear that the issues involved are fit for decision on this record.

The West Pilots' DFR theory does not depend on any contingent future events such as the memorialization of a finalized CBA or seniority integration agreement. The district court explained why the issues were fit for decision and the parties will suffer hardship if we decline to consider the issues:

> The issues fit for decision are these: Whether USAPA adopted and presented its seniority proposal without any legitimate union objective, solely to benefit East Pilots at the expense of West Pilots, and if so whether the West Pilots are entitled to damages and an injunction therefor . . . . USAPA concedes it will never bargain for implementation of the Nicolau Award. It is constitutionally hostile to doing so. The Airline has accepted the Nicolau Award, expressing no opposition to it, and the union has failed to show any legitimate reason (or plausible future reason) for abandoning it. Liability flows from the process and aims of USAPA's seniority position. *The outcome of negotiations is irrelevant. Without an injunction, USAPA's seniority position inevitably impairs the collective bargaining process.*
>
> For this same reason, denying judicial review would work a substantial hardship upon the parties, includ-

> ing the Airline . . . . In addition to depriving the West Pilots of legitimate representation, USAPA's bargaining position leaves the Airline to decide between a lack of a single CBA and an unlawful single CBA.

(Emphasis added).

I agree with the district court that, given the "precise legal question" raised by the West Pilots, this case is "fit for decision." As the district court correctly observed, given the constitutional commitment of USAPA to date-of-hire principles —principles irreconcilably opposed to the compromise embodied in the Nicolau Award—"the outcome of negotiations is irrelevant." As a result, the question presented in this case does not pivot on any " 'contingent future events that may or may not occur as anticipated, or indeed may not occur at all.' " Maj. Op. at 8006 (quoting *Cardenas v. Anzai*, 311 F.3d 929, 934 (9th Cir. 2002)). The West Pilots' claimed "injury is *certainly* impending, [and] that is enough." *United States v. Streich*, 560 F.3d 926, 931 (9th Cir. 2009) (quotation marks omitted). Instead, as the district court found, "USAPA has misled the majority about its power to improve their seniority prospects at the expense of the West Pilots. The will of the East Pilots springs from a mistaken understanding of the law and mismanaged expectations. *If this is an impasse, it is one USAPA has goaded on.*" (Emphasis added). The impasse is not evidence of the lack of ripeness of the West Pilots' claims. It is Exhibit A in their case—it is itself evidence of USAPA's intractability on behalf of the East Pilots. Again, as the district court found, "USAPA has made plain its intent never to bargain for the Nicolau Award," and time appears to be on the side of the East Pilots.[1] Under these circumstances, the West Pilots need not "await the consumma-

---

[1]Although the West Pilots are not claiming that USAPA has "deliberately" delayed completing a CBA, Maj. Op. at 8008 n.2, the majority notes that West Pilots have been furloughed and that they would not have been furloughed under the Nicolau Award, *id.* at 8007.

tion of threatened injury to obtain preventive relief." *Id.* (quotation marks omitted).

When the East Pilots campaigned to decertify ALPA and replace it with USAPA, a new union constitutionally committed to pursuing date-of-hire principles, a DFR claim by the West Pilots would not have been ripe. As the Second Circuit explained in *Ramey v. District 141 International Association of Machinists and Aerospace Workers*, 378 F.3d 269 (2d Cir. 2004), "a breach [of the duty of fair representation does not] occur[ ] when a union announces an *intention*, even if it does so unequivocally, to advocate against the interests of its members in the future." *Id.* at 278. But when USAPA won the certification election and refused *in practice* to bargain for implementation of the Nicolau Award, a previously bargained-for award that the Airline had already accepted and continues to accept, this was not the announcement of an intention, but actual "act[ion] against the interest[s] of" the West Pilots—the precise point at which, it seems to me (and to the Second Circuit), a DFR breach occurs. *Id.* ("the breach occurs when the union acts against the interests of its members"); *see also Santos v. Dist. Council of New York City & Vicinity of United Brotherhood of Carpenters and Joiners of Am., AFL-CIO*, 619 F.2d 963, 970-71 (2d Cir. 1980) (holding that a union breached its duty of fair representation, and a DFR claim began to accrue, at the time "appellants were aware that the [union] was not proceeding in good faith to seek enforcement of [an arbitration] award").

The majority argues that this case will not be ripe until "the airline responds to [USAPA's seniority] proposal, the parties complete negotiations, and the membership ratifies the CBA," Maj. Op. at 8007, but I respectfully disagree. Certainly this case might be "riper" were plaintiffs to wait for these future events, but when USAPA took the reins as the West Pilots' union and refused to pursue the Nicolau Award, USAPA's promise moved from abstract disagreement to adjudicable legal controversy. The future events cited by the majority are

not likely to occur anytime soon, and plaintiffs will be harmed all the while. In the words of the *Thomas* Court, "[n]othing would be gained by postponing a decision . . . ." 473 U.S. at 582.

The ripeness inquiry is not concerned with whether a case is as ripe as it possibly could be. Twelve of the plaintiffs in *Thomas* had never even entered into FIFRA arbitration. Their claims would have been riper had they undergone FIFRA arbitration prior to joining with Stauffer in a challenge to FIFRA's arbitration procedures. Yet the Court noted these plaintiffs' "continuing uncertainty and expense" and explained that "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief." *Id.* at 581 (quotation marks omitted). No one disputes that the West Pilots are now suffering, and will continue to suffer, "continuing uncertainty and expense" due to the seniority impasse. They are entitled to have their claims heard.

I respectfully dissent.